SILVER KING COALITION MINES CO. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5860. Decided June 22, 1937. (69 P. [2d] 608.)

512

*R. J. Hogan,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *Grover A. Giles,* Deputy Atty. Gen., for defendants.

WOLFE, Justice.

Claude Hancock, an employee of the Silver King Coalition Mines Company, on June 9, 1932, in the course of his employment, was caught between a motorcar and an ore chute, receiving a crushing injury. It tore away the left clavicle at the breast bone and broke the first seven ribs from their unions with the breastbone. The seven ribs reunited but not at their normal positions. They overlap and are reunited by ankylosis. This has compressed this left side and decreased the diameter of his thorax. The depression is one to one and a half inches below the plane of the sternum or breastbone.

It appears that on March 30, 1933, the commission, after the man was examined by its medical committee, sent the conclusions of that committee to the plaintiff with a letter of which the following is the main paragraph: "In view of the conclusions reached [conclusions of the medical committee], we recommend that Mr. Hancock be paid on the basis of 50% permanent partial loss of bodily function, which would be 100 weeks compensation, and would be in addition to the compensation paid on account of temporary total disability."

The medical committee had found a "total bodily disability of 50%." In pursuance of this recommendation, plaintiff paid compensation for permanent partial disability of $1,125 to March 3, 1935. On October 5, 1935, Hancock made an application for "further disability and compensation covering same." A hearing on this application was had by the commission on December 9, 1935, at which time the attorney for plaintiff objected on the ground that the case was closed and the condition fixed and an award made for the full disability. In answer to this objection, the auditor commissioner made the following observation: "Let the record show that the Commission has at no time rendered a formal award in this case; that he appeared before the Medical Advisory Board on March 24, 1933, at which time we recommended through Commissioner McShane, that the applicant be paid on the basis of 50% permanent partial loss of bodily function which would be 100 weeks compensation," etc. It is therefore not clear whether the additional 40 weeks' compensation which was finally given in pursuance of this hearing of December 9, 1935, and a continued hearing had on June 18, 1936, and a medical board examination of June 26, was given on the theory that the former recommendation contained in the letter of March 30th was tentative, meaning that the commission believed that at least a 50 per cent loss of bodily function had been suffered and that plaintiff should at least pay up to that figure, leaving for final determination by the commission whether it fully or only partially covered what

would be finally determined to be the full permanent partial disability or whether 40 weeks was awarded on the theory of a change of condition. There is evidence to support the additional 40 weeks on either theory. The commission did not make a finding showing a fixation of disability. It passed on to the employer the medical committee's conclusions with the recommendation that the company pay up to that compensation. The company had the option to follow that recommendation or ask that the loss of bodily function be finally fixed.

When the commission makes or denies an award upon a hearing, that finding will stand as a matter adjudicated as to the facts as they then existed whether or not they may have all been presented. Even that which could have been presented but which was not is precluded. Where there are conditions which were not known and which could have revealed themselves only afterward, a new hearing may be had on the ground of a change of condition. A change of condition may occur when there is an actual change or where the condition is different than what it was thought to be and only could have been revealed by subsequent events. This is because only the actual unfolding of events could reveal a condition different than that which the commission assumed to operate on. The condition of an applicant passed on by the commission is one which at the hearing was revealed or which, with reasonable investigation, could have been revealed and not one which though existing, could not with reasonable examination have been known. But where the commission has made no award or finding but simply a recommendation, it must be taken as tentative and as leaving the case still open for final adjudication. So, on the first theory, the addition of 40 weeks may be upheld.

It may be upheld on the second theory, that there was actually a changed condition. The recital of some additional facts is here relevant. Between the hearings of December 9, 1935, and June 18, 1936, Hancock had another operation to see if the collarbone or clavicle could be better articulated

with the sternum. Since the accident there had been no boney union but only a fibrous one. This resulted in the thorax end of the clavicle floating. It pressed on the thorax at times affecting his breathing. It, of course, prevented heavy lifting or manual labor of the type which Hancock had done or was trained to do. He had been a motorman running a motorcar in the mine. He was able to raise his arm and had movement in front and back, but with discomfort and tiring. His chest room had been lessened.

There had been no diminution of functioning of the lungs, but there was a pressing, especially when they became fully inflated by more complete filling of air. Hancock had been trying to improve his lungs by a certain amount of hill climbing. As stated before, the Medical Advisory Board found a 50 per cent loss of total bodily function on March 24, 1933. And on June 26, 1936, another Medical Board found a total bodily loss of 50 per cent. At this examination counsel for both plaintiff and defendant Hancock were present. Dr. Galligan, who had charge of Hancock since the accident and who had performed several operations to rehabilitate him, including the one between December 9, 1935, and June 18, 1936, testified to a loss of from 50 to 60 per cent of total. The additional 40 weeks given by the commission actually amounted to a loss of 70 per cent of the full maximum of 200 weeks. There was no direct evidence of a 70 per cent loss by anyone.

It is contended by plaintiff that there is (a) no evidence of a change of condition, and (b) that there is no evidence of a loss of 70 per cent. But the commission had seen Hancock at the meeting of the medical committee held on March 24, 1933; it had seen him at the hearing of December 9, 1935, and at the hearing of June 18, 1936, and at the time he was examined by the new medical committee on June 26, 1936. True, there is nothing in the record where the members of the commission recorded their observation so that we could tell whether there was evidence by ocular preferment upon which they could make a finding.

And that would be necessary if the commission concluded on their own observations. *Spencer* v. *Industrial Comm.*, 87 Utah 336, 40 P. (2d) 188.

In some cases a degeneration might be so marked between two dates that any person could note it. But if this is to be the basis of the commission's finding, the record must record it—not just the times of observation as the Attorney General seems to argue in his attempted differentiation of the Spencer Case from this one, but the actual conditions as the eye of the commission sees them must be put in the record so that this condition as noted by the Commission may be by us compared to the previous condition as shown by the record. But cases do not always permit of discernment of a change of condition by observation. It must usually depend on evidence and ofttimes on expert testimony. In this case we have evidence. True the evidence of the doctor is that Hancock's condition was fixed on March 24, 1933, and that after the last operation, it was the same. But we have held that the commission is not required to follow the expert testimony. Hancock himself testified that his condition had gotten worse. He testified as follows:

"Q. Mr. Hancock, when you received the last compensation, since then have you noticed a definite change in your physical condition? A. Yes, sir.

"Q. In what way, any particular part of your body? A. Yes, my collar bone and joint in front. * * * In my chest, it seems on the left side, and also my back. * * *

"Q. Mr. Hancock, in regard to the collar bone, at the time you were released from the hospital had the bone united? A. * * * it has gradually been getting a little looser."

He further testified that for about eighteen months or more he had been compelled to sleep with his left arm somewhat behind him in order to prevent "folding," that is, the collarbone from pressing in on his thorax which made breathing more difficult.

"Q. In regard to your back, do you notice any difficulty in your back? A. Yes, it is like—it seems like I was getting down lower all

the time. I try to sit up like this and it is impossible, and fall over that way and it causes a lot of pain.

"Q. Do you notice any physical changes? A. Yes. Any sort of labor, or walking or climbing up a hill where you have to balance yourself, it causes pain.

"Q. Have you noticed any change in the formation of your back? A. Yes, this whole hump has come since I left the hospital, this deformity.

"Q. You had no injury to your back at that time? A. No.

"Q. This hump has developed since when? A. Since 1933."

This was some of his testimony at the hearing of December 9, 1935. At the hearing of June 18, 1936, *after* the operation to see if a better union of the clavicle could be had, he testified:

"Q. Mr. Hancock, since the operation have you noticed any improvement or any change in your condition in regard to the collarbone? A. No change whatever, really worse than it was before.

"Q. In what way? A. Sore and loose. It is loose and looser and really causes more pain."

He testified his back bothered him more since the operation. After any length of time walking or sitting, his back "gets awfully sore and starts to pain." Dr. Galligan stated he did not expect and did not find the results of the last operation very beneficial. He thought there was a "little more joint surface" than there was before. He thought the disability somewhere between 50 and 60 per cent. Dr. Galligan testified the hump on the back was growing larger for postural reasons, but said it would be permanent and that the method of standing might be related to the injury.

We think, therefore, there is sufficient testimony independent of any conclusions derived from mere observation to support the award of the commission on the theory of a changed condition; at least it cannot be said that the finding was arbitrary or capricious even though the commission came to its conclusions largely on the testimony of Hancock and against the testimony of the doctors.

The commission evidently concluded that the sum of $1,125

for this man's disabilities was too little in view of the testimony of the limited field of economic usefulness. We cannot say the award was not supported by evidence or the finding arbitrary.

Something has been said by both plaintiff and respondents as to the competency of experts to testify as to ultimate facts, quoting excerpts from the cases of *Spencer* v. *Industrial Commission*, supra, and *Kelly* v. *Industrial* Commission, 80 Utah 73, 12 P. (2d) 1112. Certainly, the doctors could testify as to the loss in bodily function. That would be directly "down their alley." And the compensation provided for by section 42-1-62, R. S. Utah 1933, is founded on *loss of function*. The section, in part, reads:

> "For any other disfigurement or the loss of bodily function not otherwise provided for herein, such period of compensation as the commission shall deem equitable and in proportion to compensation in other cases, not exceeding two hundred weeks."

There still seems to be considerable confusion among the bar as to the basis of compensation. The writer perhaps cannot state it any better than it was put in the dissenting opinion in the case of *Caillet* v. *Industrial Commission*, 90 Utah 8, 58 P. (2d) 760, at page 763, where it was said:

> "Compensation is payable for disability to earn caused by accident in employment. Temporary total disability is founded on actual disability. Permanent partial is founded theoretically on loss of earning ability, but is absolute in law whether loss of earning ability is actually suffered or not. The law presumes the loss of earning power. It is presumed on loss of bodily function. If an arm, or leg, or eye is lost, the employee gets compensation even though he earns ten times as much as formerly as, for instance, a radio announcer. The vocational factor is not an element in the loss of bodily function. *Broderick* v. *Industrial Commission*, 63 Utah 210, 224 P. 876; *Amalgamated Sugar Co.* v. *Industrial Commission*, 75 Utah 556, 286 P. 959. The complete loss of use vocationally [this word should be omitted] was equivalent to a loss of the member because if a member left on is no more use than a member off, but rather an impediment, the law treats it as if it were off. *Broderick* v. *Industrial Commission*, supra; *Spring Canyon Coal Co.* v. *Industrial Commission*, 74 Utah 103, 277 P. 206. And any loss of bodily function not provided for in the schedule in sec-

tion 42-1-62, R. S. Utah 1933, is to be based on 'proportion to the compensation in other cases' provided in the schedule. That results in the necessity for evidence on the remaining function in terms of the original or full physical function of the member. * * * It cannot depend on whether or not the economic situation prevents him from getting a job. The test is his capacity, not whether the economic situation permits that capacity to be applied in industry."

Doctors cannot testify as to the economic fitness of an applicant to carry on certain work, unless they show that they are familiar with what is required in that work. For that reason, they cannot ordinarily testify as to the extent an applicant is industrially or economically incapacitated. *Price* v. *Industrial Comm.*, 91 Utah 152, 68 P. ∎ (2d) 592. But they may always testify as to the amount of loss of physical functions, if material. Where an applicant has lost an arm or leg or other member or the apparent complete use thereof, there would seem to be little need for expert testimony, but in cases where the compensation is to be based on loss of bodily function not provided for in the schedule contained in section 42-1-62, supra, the doctors may give an opinion as to that ultimate fact and may give it in terms of a percentage of the full functioning as before the injury occurred. *Price* v. *Industrial Commission*, supra.

Where the ultimate question is not one of loss of bodily function, but actual partial or total disability economically and industrially, as provided for in the first paragraph of section 42-1-62, R. S. 1933, and section 42-1-65, the loss of bodily function is only an aid to such ultimate question and the doctors should testify only as to such loss and not to the ultimate question of industrial or economic disability, except when the doctor qualified in addition to his medical knowledge that he has sufficient knowledge of what physical or mental abilities a certain occupation or vocation calls for, in which case he may express his opinion as to the ability of the applicant to carry on in such particular work.

Where the testimony is as to common industrial, economic, or household functions, such as climbing ladders, sweeping,

digging, etc., the doctor may state the man's ability to physically function in such terms; it being presumed the doctor has knowledge of the physical movements and functions employed in those common activities. *Price* v. ■ *Industrial Commission,* supra. If there is any ambiguity in the language of the Spencer Case, it is hoped that what has been here said will clear it up, counsel for respondents having quoted at length from that case.

It should be noted that there is a seeming difficulty in the application of the last part of section 42-1-62, above quoted, when the loss of bodily function approaches a total loss. Section 42-1-63 provides that certain loss of bodily members or parts or the total loss of use of them shall in law be considered as total permanent disability. For such loss the sufferer obtains compensation for 260 weeks at 60 per cent of his wages, thereafter until death at 45 per cent of his wages. with a maximum of $16 and a minimum of $7 a week provided. The next zone takes into consideration cases which are not in law total permanent, but which the commission finds so as a matter of fact. The question may be well asked, and it is collaterally material in this case, what articulation the Compensation Act makes between those cases where the loss of bodily function is not total but such a great percentage of the full functions as to practically make the applicant industrially or economically totally and permanently disabled.

Under that part of section 42-1-63, above referred to, the compensation is still based, as in the case of a loss of an arm or leg, on *loss of bodily function* regardless of earning power. As stated in the dissenting opinion of the Caillet Case, a man might suffer great loss of bodily function under this section and be paid for that loss, although it were shown that he was earning ten times as much as before as a radio announcer, and, vice versa, a brilliant pianist who lost a finger would get only compensation for the loss of his finger, although his livelihood was gone. The compensation for permanent.

partial disability is measured either by the schedule or in proportion thereto and as deemed equitable on the *loss of bodily functions alone,* and the maximum is 200 weeks. But if the applicant claims total and permanent disability the issue is as to whether he is totally and permanently disabled *industrially* and *economically.* There is a twilight zone where one blends into the other. That is, the loss of bodily function may be so great as to leave one totally and permanently disabled industrially. Thus a person with a 90 per cent loss of bodily function might be able to prove himself totally and permanently disabled. If so, he would take himself out of the class of applicants limited to recover under the paragraph of section 42-1-62, above quoted, and put himself in the class where his compensation should be determined by his total lack of industrial or economical ability. But until that point is reached, the permanent partial disability is seemingly compensated for on loss of bodily function alone with a maximum of 200 weeks. The fact that a workman may stop in the zone of permanent partial not quite going over into the zone of permanent total, and therefore obtain a maximum of only 200 weeks, whereas, a trifle more disability would bring him into what the commission might find as a fact to be an industrial or economic permanent total giving him 260 weeks plus 45 per cent for the remainder of his life, leads us to wonder whether this 200 weeks' maximum is supposed to be the equivalent to a total loss of bodily function as the commission seemed to conceive it in this case. The applicant had a loss of bodily function of 70 per cent. The commission, therefore, gave him 140 weeks' compensation on the theory evidently that if he had 100 per cent loss of bodily function he would have been entitled to 200 weeks. But certainly, if he had a 100 per cent loss of bodily function he would have been totally permanently disabled industrially and economically and therefore be entitled to compensation for the rest of his life.

There is nothing in the last paragraph of section 42-1-62 which requires that the number of weeks of compensation to

be given under this paragraph for permanent partial disability shall be to 200 weeks as the loss of bodily function is to the full bodily function. The requirement is that it shall be as the "commission shall deem equitable." Circumscribed by the requirement that it be in proportion to compensation in other cases. The maximum contained in the schedule is 200 weeks for the loss of an arm. The loss of an arm would not be a total loss of bodily function. It is therefore odd that in the unscheduled types of loss of bodily member or loss of bodily function the commission should assume that the maximum of 200 weeks is to be taken as the equivalent of a total loss of bodily function. It would not seem to be necessary for a person to have a 70 per cent loss of bodily function to obtain 140 weeks of compensation. He might have such percentage of loss and obtain 200 weeks if the loss of function was comparable to the loss of function suffered by the loss of an arm at or near the shoulder or comparable thereto. And, put in another way, the applicant in this case might suffer a 50 per cent loss of bodily function and be granted 140 weeks if it was comparable to the loss of a leg between the knee and the ankle, which yields in the schedule 140 weeks, because it must be in "proportion to the compensation in other cases"; such loss of a leg being one of the other cases. Or, if it were somewhat less than the equivalent of the loss of function entailed by the loss of a hand, which yields 158 weeks, it would be in proportion. The mere fact that there was medical testimony that the loss was 50 per cent of the full bodily function would not necessarily make an award of 140 weeks erroneous. Perhaps the loss of a leg between the knee and the ankle does not involve more than 50 per cent loss of total bodily function.

The award of the Industrial Commission is affirmed; costs to respondents.

FOLLAND, C. J., and EPHRAIM HANSON and LARSON, JJ., concur.

MOFFAT, J., concurs in the results.