## CROW v. INDUSTRIAL COMMISSION et al.

No. 6452.  Decided August 11, 1943.  (140 P. 2d 321.)

See 71 Workmen's Compensation Acts, sec. 1246; 28 R. C. L. 826 (8 Perm. Supp. 6250).

*O. W. Moyle,* of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., *Zar E. Hayes,* Deputy Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

WADE, Justice.

On March 24, 1935, applicant Claude Crow, while working as a tool dresser on a drilling rig for H. M. Robinson at Tooele County, Utah, suffered an injury to his back while lifting heavy machinery with a crowbar. He was unable to continue work and shortly thereafter he was brought to Salt Lake City, where he was hospitalized a number of times and has been under medical care most of the time up to the date of the hearing. At the time of the hearing he had not returned to work nor had he performed any services for remuneration. The State Insurance Fund was the in-

surance carrier and it, apparently without any decision of the Industrial Commission, voluntarily paid the medical and hospital expenses and $16 per week to applicant for a period of six years from the date of accident. At the end of that time the State Insurance Fund took the position that applicant was not totally and permanently disabled and discontinued the payments and at applicant's request the Industrial Commission granted a hearing thereon.

The matter was heard on June 19, 1941. Frank A. Jugler was the only commissioner who attended the hearing. On June 30, 1941, Commissioner Jugler ceased to act as a member of the Commission and did not participate in the decision. The Commission rendered its decision on August 14, 1941, denying further compensation on the ground that applicant was not totally and permanently disabled and applicant brings the matter to this court.

Defendants were clearly not estopped from claiming that applicant was not totally and permanently disabled by reason of having paid $16 per week for six years because he did not change his position or relinquish any right in reliance thereon. Also the Commission having made no previous decision the question of whether it can █ change a former decision without a showing of a change of condition is not involved in this case. Admittedly applicant's disability, to the extent that he was disabled at the time of the hearing is permanent. The evidence tends to show that he will probably get worse but there was no evidence that he will get better.

The only question on the proof is whether there was substantial evidence from which the commission could reasonably find that the applicant was not totally disabled  There was testimony to the effect that applicant had suffered only a bodily functional disability of from 25% █ to 30% and it is argued that he was therefore not totally disabled. This does not necessarily follow. The fact that a man's back retains 75% of its normal functions does not prove that he has the strength or endurance to do 75% of

a days work. A person may retain all the normal bodily functions of his organs and still be so weak or be in such pain that he would be totally disabled from obtaining remunerative employment. He may also be physically able to do certain kinds of work and still be unable to obtain such employment on account of lack of training or skill in such fields. In either of these events he would be totally disabled.

The testimony here went much further than merely to show applicant's lack of functional disability. Three doctors testified that in their opinion he is able to perform ordinary manual labor, specifically mentioning carpenter work, farming, plowing and harrowing and digging with pick and shovel in mines. They did concede, however, that he could not do the most heavy lifting or the most difficult labor. From the kind of work these doctors testified he could do, they clearly indicated that they did not agree with applicant's description of his condition nor with the description of his condition given by the doctors who testitfied in his favor. If he is capable of doing this kind of work then he would have no trouble in obtaining remunerative employment, and he is not totally disabled. The evidence was therefore sufficient from which the commission could have reasonably so found.

This case, however, must be reversed for another reason. Commissioner Jugler, the only commissioner who heard the evidence and saw the demeanor of the witnesses while testifying did not participate in the decision, and as far as the record discloses, he made no findings, either written or oral which made his opinion of the evidence available to the commisison in making its decision. Where, as in this case, the evidence is not entirely documentary, and there is a sharp conflict in the evidence, the credibility or lack thereof, of the witnesss is of paramount importance. Only a person who actually hears and sees a witness while testifying is in a position to determine the weight or credibility which should be given to such testimony. The opinion of

such a person is a necessary factor in making any findings of fact. The situation is analogous to that of a judge who has tried a case, sitting without a jury, and whose office is either terminated or he resigns or dies before he has made findings of fact and conclusions of law. As stated in *Case* v. *Fox et al.*, 138 Or. 453, 7 P. 2d 267, page 268,

" * * * we can readily perceive that a successor to a trial judge who was removed by death before he had announced any findings of fact, or had in any other manner pronounced judgment upon the cause, could not render findings of fact * * *"

the reason being that the issue presented requires a weighing of testimony. See also, *Labont* v. *Lacasse*, 78 N. H. 489, 102 A. 540; *McAllen* v. *Souza*, 24 Cal. 2d 247, 74 P. 2d 853; *Bahnsen* v. *Gilbert*, 55 Minn. 334, 56 N. W. 1117.

There is a conflict in the authorities as to the power of a judge other than the one who tries the case to render a judgment or make a decision thereon. 30 Am. Jur. 750, Sec. 38.

Where there is a conflict in the testimony, and the weight and credibility to be given testimony of the various witnesses is the determining factor, in order to accord a "full hearing" to which all litigants are entitled, the person who conducts the hearing, hears the testimony, and sees the witnesses while testifying, whether a member of the board, or an examiner or referee, must either participate in the decision, or where, at the time the decision is rendered, he has severed his connections with the board, commission or fact finding body, the record must show affirmatively that the one who finds the facts had access to the benefit of his findings, conclusions and impressions of such testimony, by either written or oral reports thereof. This does not necessarily require that all of the commisisoners must be present at the hearing, or even that the one hearing the evidence must concur in the result, but his opinion on the testimony must be available to the commission in making its decision. This is in harmony with the

law on this subject regarding commission and quasi-judicial triers of fact in the Federal Courts. See 1 Vom Bauer's Federal Administrative Law, 318 to 322, section 310 to 313; *United States ex rel. Ohm* v. *Perkins*, 2 Cir., 79 F. 2d 533; *United States* v. *Nugent*, 6 Cir., 100 F. 2d 215; *Morgan* v. *United States*, 1936, 298 U. S. 468, 80 L. Ed. 1288, 56 S. Ct. 906; *Id.*, 1938, 304 U. S. 1, 58 S. Ct. 773, 82 L. Ed. 1129.

The showing here does not meet these requirements and the case is therefore reversed and remanded for a rehearing, with costs to applicant.

McDONOUGH, J., concurs.

WOLFE, Chief Justice (concurring specially).

It was contended by the plaintiff that the Commission was estopped from holding that he was not totally disabled from securing and retaining remunerative employment by reason of the State Fund having paid disability benefits to him for the six years period subsequent to his injury especially in view of the fact that there had been no improvement.

The insurance Carrier is not "estopped" by its payment of compensation. It does not pay at the peril of admitting the extent or duration of the disability. It is not estopped because the applicant has not acted to his detriment in reliance on its action. Its action in paying compensation as if the disability were total for an indefinite period without requiring applicant to have it found by the Commisison as total is all for the applicant's benefit. To hold otherwise would discourage a practice highly beneficial to all parties.

It does not appear anywhere in the record that the Industrial Commission made any finding as to the extent or duration of applicant's disability until August 14, 1941. On that date the Commission found that Crow was not totally and permanently disabled. Therefore, there is in this case no question of the Commission's having made a

finding or an award prior to August 14, 1941, to the effect that the applicant was totally or permanently disabled, which it could not change except on change of condition. The fact seems to be that the State Insurance Fund, as is the practice of many insurance companies, simply paid the employee $16.00 per week because it concluded he was totally disabled, but by so doing for an indefinite time it did not admit that his condition was one of permanent total disability. Every now and then it had a physician examine the man and report to it on his condition. This of course is a wise practice because it leaves the matter of determining the extent and duration of the employee's disability open for future finding. Meanwhile the injured person is paid $16 per wek. If the insurance carrier could not pay for an indefinite time in order to see if there would be an improvement both as to extent and as to duration but must seek at once to have determined the extent if not duration of his disability, much hardship and injustice might ensue to the applicant or to the carrier. The Commission would have to hazard a guess and once it committed it would be subject to the objection that it could not alter its award unless the conditions changed. In cases where there is a disability partial or total in extent for an indefinite time it is better if the matter be left for future determination as long as the party is receiving compensation for the support of his family.

I am in accord with the statement of the prevailing opinion that the person who conducted the hearing, whether a member of the body which must eventually act or not, should convey his conclusions to the members of the body who did not participate in the hearing in the form of tentative findings or by consultation while he is connected ■ with the commisison, board or official whose duty it is to act. My doubt arises on the question of whether the record should affirmatively show such was the case where the record showed that the member or examiner who conducted the hearing had severed his connection with the

body for whom he had so acted between the time of hearing and the ultimate handing down of the decision or whether it should not be presumed that he had deliberated with the members of the body before his departure. I do not deem it a matter of great importance because it would be only occasionally that an off-going member of a commission or board or an examiner or referee with authority to hear witnesses for such body would depart before the decision was handed down or without making tentative findings. It may in this special case, in order to assure the reviewing tribunal that a "full hearing" was had, be salutary to require the record to show the fact of communication of the examiner's conclusions before his departure.

But by so saying I do not mean to imply that administrative conferences or deliberations of the administrators or their mental processes can be inquired into to ascertain whether they accorded a fair hearing or due consideration to the questions presented. That can no more be inquired into than the deliberations or mental processes of jurymen. See 36 Columbia Law Review, 1156. In *Cunnard S. S. Co.* v. *Elting*, 2 Cir., 1938, 97 F. 2d 373, 376, it was contended that an order made by the assistant secretary of labor was illegal because no proof was adduced that he had considered the evidence upon which his order purportedly rested. But the court said that there was no proof that he had not done so;

"on the contrary, there is a presumption that he did his duty. In the absence of evidence to the contrary that is sufficient."

The point decided in the opinion of Mr. Justice WADE is confined to the narrow question of whether the record should reveal whether those responsible for deciding a case who have not heard the evidence have been given the benefit of the observations and conclusions of the person who did conduct it where it appears that such person severed his connection with the agency before the decision was rendered.

I see no necessity of comparing it to the case where a judge hears the evidence and dies or resigns before making findings which reveal his conclusions. That touches the much larger point as to whether a hearer must be a decider.

I call attention to the part 2 of Chap. VIII, dealing with the subject of "Fair Hearing" contained in Professor Gellhorn's excellent case book on Administrative Law. The subdivision poses the question: "Must the One Who Hears Be the One Who Decides, or May One Person Receive and Another Consider the Evidence?" The comments of Professor Gellhorn, in the light of his unique opportunity as Director of the Attorney General's Committee on Administrative Procedure, to view the entire field of Federal Administrative Procedure and in the light of his intensive studies in the field of Administrative Law, are most valuable. He states:

"Of course it is a commonplace that most administrative agencies of importance, such as the Interstate Commerce Commission, the Securities and Exchange Commission, the Federal Communications Commission, the United States Maritime Commission, and the like (and their state counterparts) do not see the witnesses in matters coming before them. Their hearings are ordinarily conducted by trial examiners or other presiding officers, who have no power to find the facts finally and who sometimes are not even called upon to make recommendations to their superiors. Whatever may be the desirability of the procedure, there is no real doubt of its validity, for administration would come to a virtual standstill if the heads of governmental agencies were themselves required to preside at every hearing to receive testimony.

"In the light of this observation [*United States* v. *Nugent*] 6 Cir., 1938, 100 F. 2d 215, certiorari denied, 1939, *Fidelity & Columbia Trust Co.* v. *United States*, 306 U. S. 648, 59 S. Ct. 591, 83 L. Ed. 1046, becomes an interesting case to note. That case involved a suit against the United States under the Tucker Act [28 U. S. C. A. § 764] as amended. The trial judge had resigned after the trial, without having announced a decision. The case was thereupon referred to another judge, who entered findings of fact and conclusions of law. Upon the government's appeal, it was held that this was improper, since the successor judge did not hear the testimony, but relied solely upon his consideration of the briefs of the parties and the transcript of the evidence taken on their behalf. The decision to this effect rested largely

upon the court's belief that the statute impliedly forbade the course pursued by the successor judge. When the plaintiff petitioned the Supreme Court for writ of certiorari, the Government opposed the petition. It supported the judgment below by an argument based on no narrow statutory ground, but on the broad proposition that 'This rule is of the utmost importance, because only the trier of facts, be it judge or the jury, can observe and consider the opportunity of the witness for knowledge, the intelligence of the witness and his conduct on the stand, the probability or improbability of his statements, prejudice or interest, corroboration, and facts and circumstances reflecting on his credibility, as well as his relationship to the parties.' (Brief for the United States in Opposition, No. 658, Oct. Term, 1938, p. 7.) On the face of it the Government seems to have wiped from its memory the practice of judges to refer cases to special masters and referees. [However, statutes usually require special masters and referees to file with the court, reports, findings or recommendations] for the purpose of taking testimony in cases which only the judges can decide; moreover, it seems to have put itself in the anomalous position of saying that a Federal district judge cannot effectively find facts unless he saw the witnesses, whereas it has argued before and since that an administrative officer may do so with so great effectiveness that reviewing courts must accord much weight to his conclusions. Perhaps the most charitable view is that the case was not considered to be very important at the time, and someone was asleep at the switch in the Solicitor General's office when the brief passed through on its way to the Supreme Court.

"Be that as it may, there are a number of instances of judicial disapproval of fact-finding by a judge who did not himself preside at the trial. But such cases seem on the whole to express an aspiration not likely to be achieved in an administrative process which also takes into account the aspirations of speed and flexibility."

Another quotation is from the case of *Farran* v. *Curtis Pub. Co.*, 1923, 276 Pa. 553, 120 A. 544, 546. It deals especially with a compensation award. The quotation follows:

"The opinion of the workmen's compensation board was written by a member who did not sit at the hearing. Said the court 'This practice, while not ground for reversal, is not commended. When facts are required to be found, and such is the case in all proceedings of this character, it is especially advisable that the commissioner who presides at the hearing and sees the witnesses and hears them testify should find the facts. He is much better fitted to give proper effect to the testi-

mony than one who has before him merely the typewritten copy of the evidence.' "

It must be admitted that the nature of the hearings of the Industrial Commission in determining compensation claims is judicial rather than legislative or executive. An award is a money judgment. It involves an adversary proceeding where the right of cross-examination is valuable. Procedure in administrative agencies must be fashioned to best perform the job required by the legislature. Procedures must therefore necessarily vary according to the type of function to be performed, the practical exigencies of the task and the nature of the purpose for which the agency is designed. See "Requirement of Opportunity to be Heard in the Administrative Process"—Kenneth C. Davis, 51 Yale Law Journal, May 1942, p. 1093. Is the function investigatory or adversarial in nature? Is its primary purpose to find facts and make a report, or is it to regulate or supervise business or industrial activity, or to police or control such activities (which means ferreting out abuses and bad practices and requiring them to cease as well as making rules for their prevention or constructive guidance), or to license businesses, professions, or occupations, or to inquire into rates and charges and fix the same at reasonable levels or a mixture or combination of these purposes? Certainly the type of procedure in investigating and fixing a minimum wage for women must necessarily differ from that of determining a claim for compensation. There is a tendency to think that there is and should be one type of procedure and review for all administrative agencies. This is a great mistake founded on insufficient understanding of the field of administrative law. The approach to the problem is well stated by Mr. A. H. Feller in his article entitled "Administrative Procedure and the Public Interest—The Results of Due Process," 25 Washington University Law Quarterly, April 1940, p. 308, as contained in 1940 C. C. H., Legal Periodical Digest 3548 where it is said:

"In considering administrative procedure, we should try to isolate and eliminate the element of current political controversy; we should leave behind our sympathy with or antipathy to this or that particular statute; we should put behind our sympathies or antipathies with regard to government regulation of business as a general problem; and we should exclude from discussion the issue of the choice between court or commission for purposes of regulation. Having put aside these considerations, the question for discussion is this: How can administrative procedure best be adapted to the efficient dispatch of public business entrusted to an agency without the impairment of essential private rights?"

See also "A Full Hearing Before Administrative Agencies," by Warren H. Wagner, in 5 I. C. C. Practitioner's Journal—June 1938, pp. 422-434.

Both this latter article and that of Mr. Feller's were prompted by the first and second Morgan cases. *Morgan* v. *United States,* 298 U. S. 468, 56 S. Ct. 906, 912, 80 L. Ed. 1288, and *Morgan* v. *United States,* 304 U. S. 1, 58 S. Ct. 773, 82 L. Ed. 1129. These two cases stimulated critical articles in many of the law journals of the nation. See A. H. Feller "Prospectives for the Further Study of Federal Administrative Law" (1938) 47 Yale L. J. 647; Kathryn Pearlman "Effect of the Morgan Decisions on the Position of the Trial Examiner." 10 George Washington Law Review, Nov. 1941, p. 43-62; also case notes in 12 Wis. L. R. 245 and 36 Columbia L. R. 1156. But all the consternation raised by the Morgan decisions should not blind us to the fact that it was not there held that he who listens to the evidence must decide the case. It was said "the one who decides must hear," but it was further held that "to hear" as used in the statute means that the deciding officer must address himself to the evidence and the argument and that the argument may be written. Said Mr. Chief Justice Hughes in the first Morgan case:

"This necessary rule [the one who decides must hear] does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be

sifted and analyzed by competent subordinates. Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense. And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them."

The upshot of the matter is that even where the Administrative Agency is performing functions in their nature judicial, as is the case in hearing compensation claims, the requirements of due process do not require that he who conducts the hearing must make or participate in the decision. It is not analogous to the situation where a judge dies or resigns after hearing the evidence but before registering his conclusions. There is usually continuity of personnel on Administrative Agencies even though there may be rotation in office. What is required to satisfy the demands of due process, that is, of a full or fair hearing, is that he who observes the witness and listens to the evidence must transmit his observations or conclusions to those others who, whether they are superiors or associate members of the same agency, are to decide and this may be done in the form of tentative findings or by a report or recommendations or orally in conference. And ordinarily where the examiner is still connected with the agency at the time it renders its decision it will be presumed that he has communicated his observations and conclusions to the body which employs him or of which he is a part but where he has, shortly after the hearing and before decision is handed down, severed his connection with the agency, I see no objection to requiring that the record show that the remaining or new members who are to make the decision have had the actual benefit of his impressions and conclusions, and especially is this desirable where, as in the instant case, the outcome depends on non-documentary evidence which is in sharp conflict.

While the Commission in this case might well, without any strain of conscience and in view of the humane pur-

poses of the Act, have found the applicant totally and permanently disabled for the rest of his life in view of his very unfortunate condition, it did not do so. Sec. 42-1-63, U. C. A. 1943, makes certain losses, in law, total permanent disability. Then there is a zone in which the disabilities may be total and permanent in fact although not made so by statute. In this zone the Commission must determine whether the loss is permanent and if so, its extent. And this means that it may have to decide that it is not permanent and total, that it does not run to totality but is only partial. Starting from the other side, under Sec. 42-1-62 there are certain disabilities named in law as partial permanent disabilities. Under the same section there is an added zone of disabilities partial in extent and permanent in duration which are not specifically made so in law. Within this zone the commission must determine the extent of the permanent disability and grant compensation. But here again its investigation may lead it to conclude that the disability is permanent and total. Somewhere these zones of total and partial disability approach each other to a point where they meet. That is, starting the determination under either Sec. 42-1-63 or 42-1-62 what was claimed to be a permanent total may be found to be a permanent partial and what was claimed to be a permanent partial may be found to be so much "partial" as to be total, if we may use an apparent contradiction in terms in order to dramatize the difficulties at the border line between total and partial. It is in this twilight zone that cases very nearly the same may be in one instance judged by the commission as partial although in fact on the borderline of total, while in the other instance practically the same kind of case may be judged as total although also on the borderline. Within this twilight zone where disabilities admittedly permanent in duration are so near the borderline that they may on the evidence be determined either as partial or total, it is very difficult to be consistent. It is unfortunate that the legislature did not provide for life-

long compensation for some permanent disabilities which could still be considered partial in extent although near the line of totality. But it did not do so. Consequently, wherever there is substantial evidence to support the findings of the commission we should not overturn it. We only heighten the difficulty of its task because we pick out one case from the pattern which it may have formed from examining many cases. Perhaps the Commission may accomplish it by giving the applicant the benefit of the doubt.

In this case there is evidence that the applicant was not totally disabled. I wish I could say there was no such evidence but I cannot. I must, therefore, in ■ that regard concur with the main opinion because I think the law compels us to uphold the commission's decision as being supported by the evidence.

LARSON, Justice (dissenting in part).

I concur in the order of reversal. I dissent from the holding that the evidence sustains a finding that applicant is not totally disabled.

MOFFAT, Justice (dissenting in part).

Concurring in the result, otherwise dissenting. I cannot agree that the cause should be reversed upon the ground of the failure of one of the commissioners who heard the testimony to participate or make findings. If the nonparticipating commissioner had made findings contrary to what the other two commissioners found from the record the cause could not have been either affirmed or reversed because of such disagreement.

Upon the question of total disability I state the facts and draw the following conclusion: Claude Crow was working for H. M. Robinson in Tooele County, Utah. He was injured by accident arising out of or in the course of his employment. No question is raised as to that. At the time of the accidental injury his work was that of a tool-dresser in connection with a well drilling operation. He had assisted

in lifting a large heavy metal bit. He felt a pain in his back. Later the same day he jerked or jarred his back while trying with a crowbar to lift a pipe. Later he was lifting on a barrel partly filled with gasoline, his foot slipped and he fell. He spoke of the injury but finished his shift before going to bed. He was unable to work thereafter. He stayed at the camp for a time, then with attendant pain drove his car to his home in Salt Lake City. He saw a doctor and was placed in a hospital where he remained for some months.

Application was made for workmen's compensation. The State Insurance Fund, the insurance carrier, paid compensation, for total temporary disability, for a period of about six years, or until March 15, 1941. Mr. Crow then applied to the Industrial Commisison for a hearing upon the ground he was totally and permanently disabled as a result of the injuries sustained and upon which he had been paid compensation, and requested an award for total permanent disability.

After a hearing, the Commission on August 14, 1941, found that he was not totally and permanently disabled and denied further compensation. There are two items involved. They are: (1) Is the conclusion of the Industrial Commission that plaintiff is not totally and permanently disabled contrary to the uncontradicted substantial evidence? And (2) is he permanently disabled?

The answer to the second question must be yes. It is not necessary to cite authorities or assemble reasons for that answer, except to say that all the testimony makes that fact certain, as permanent disability is presently used and understood. What is regarded as permanent now, may at a future time prove not to be so. Hope remains while life remains. "Permanent," as applied to the industrial functioning of a human being, is not thought of as the permanency of the everlasting hills. The record discloses that the applicant's condition will become progressively worse until death overtakes him. There is no difference in the expert

opinions on that matter. This leads to question (1), Is he totally disabled?

At the time of the hearing, Crow was about forty-one years of age. He was born and raised on a farm, doing general farm work. Before going to work for Mr. Robinson, he had done cement work, dug basements, worked on a rock crusher, and at a service station for about a year. His work on the well drilling machine for Mr. Robinson was strenuous, physical work. He had a common school education; his occupational effort was limited. He had no training in any field outside that of physical effort. This constituted his earning resource. He worked steadily until the time of the injury. He has not worked since. He has not applied for work, as he was told by his doctors to be quiet and not cause any strain to his back. He suffers constant pain in the lower sacro-iliac region. He wears a cast constantly and has done so since the termination of hospitalization at the time of the injury. When he attempts to go without his cast his pain increases and his condition becomes worse; after walking three or four blocks he is "all in"; at times he is forced to go to bed for two or three days at a time; these attacks occur two or three times a month; he does not sleep normally; he cannot without increasing pain sit in one position for any considerable length of time; he must change position to ease discomfort; he has no more use of his back than immediately after his injury and less use of his hands and arms; he is constantly under doctor's care. He has arthritis and whether it arose from the injury does not appear. This is his uncontradicted testimony. The Commission found the plaintiff was capable of doing light work, and "that he is not prevented from securing and retaining employment because of his injuries and is therefore not totally and permanently disabled." It will be noted the decision is negative and includes both permanent disability and total disability.

Three doctors, the plaintiff and his wife testified to facts and conclusions indicating total unfitness of plaintiff for

participation in any industrial activity. Added to this is the former finding of the Commission of total disability and the undisputed evidence that plaintiff's condition is and will become progressively worse. Three other doctors testified as to percentages of disability without definitely referring to any specific functional disability, and gave approximations varying from 25 per cent to 35 per cent. Two of them gave instances of work being done by individuals having similar disability, but in fields for which plaintiff has no experience or training. The estimated percentage of functional disability, in the abstract sense, upon opinion evidence of functional incapacity of a body member such as an arm or leg, differs in the medical testimony and does not raise a conflict in the testimony upon the basic question of industrial disability. *Caillet* v. *Industrial Commission,* 90 Utah 8, 58 P. 2d 760.

Functional disability may be a problem for expert medical opinion. Industrial disability is the problem of industry. It is a practical industrial problem. Doctors may testify as to the economic fitness or ability of a person to perform certain functions when qualified as to the functions required to be performed as related to the functional powers of the body members called upon to perform such functions. A statement of a percentage of disability in general terms adds little upon which to base a determination of disability, permanent, partial or total.

Presumptively the normal individual is the base from which a percentage of functional disability is calculated in general. That a person can do something functionally does not require a negative finding that he is "not totally and permanently disabled." The limit of two hundred weeks applies to permanent partial disability and not to permanent total disability. *Silver King Coalition Mines Co.* v. *Industrial Commission,* 92 Utah 511, 69 P. 2d 608.

Total disability may be permanent or temporary, and permanent disability may be partial or total.

"It is a matter of common knowledge that a person may be permanently and totally disabled, even though he retains his hands, arms,

feet, legs, and eyes. * * * No one who is permanently and totally disabled is expressly excluded from the benefits"

of the provisions of the Workmen's Compensation Act. *Spring Canyon Coal Co.* v. *Industrial Commission,* 74 Utah 103, 277 P. 206, 211. This must mean industrially disabled, and may not be taken out of the industrial field upon an opinion of certain functional percentages that still remain.

A disability that may be overcome by a reasonable effort is not permanent, and it is the duty of the injured person to exert a reasonable effort to overcome the injury and prepare himself for some remunerative employment. *Utah Fuel Co.* v. *Industrial Commission,* 76 Utah 141, 287 P. 931; *Caillet* v. *Industrial Commission,* supra. Sec. 42-1-62, U. C. A. 1943, recognizes a "partial disability" and a "total disability." Sec. 42-1-63 provides for "permanent total disability." Sec. 42-1-62, after specific provisions and fixing of times for permanent or partial disability, provides for compensation for "the loss of bodily function not otherwise provided for" and for

"such period of compensation as the commission shall deem equitable and in proportion to compensation in other cases, not exceeding two hundred weeks."

"Liberal as the construction of the statute should be for the purposes sought to be accomplished by it, and recognizing that any doubt respecting the right to compensation should be resolved in favor of the employee or his dependents by the Commission, we may not substitute our judgment or desires for the orders of the commission." *Batchelor* v. *Industrial Commission,* 86 Utah 261, 42 P. 2d 996, 997, and cases cited.

In the instant case, as heretofore indicated, the question of permanent disability is settled. Although the word "permanent" carries a conclusiveness with it; yet when applied to human disabilities it may not be known what nature or medical skill and science may do to make temporary that which appeared to be permanent. We say as to a disability, that it is permanent when at the time and under the circumstances no other reasonable conclusion may be drawn.

So it is as to the totality of a disability. For these reasons, it appears that the legislature provided for a continuing jurisdiction of the Industrial Commisison in compensation cases. Because compensation was paid for a period of six years does not work an "estoppel" as argued in the briefs. Upon changed conditions the powers and jurisdiction of the Commission over each case shall be continuing, and it may from time to time make such modification or change with respect thereto as in its opinion may be justified. Sec. 42-1-72, U. C. A. 1943; *Silver King Coalition Mines Co.* v. *Industrial Commission,* 92 Utah 511, 69 P. 2d 608.

Summarizing: There is no evidence to support the finding that the plaintiff is "not totally and permanently" disabled. That his disability is permanent is not disputed. Some of the evidence tends to show a functional disability stated in percentages without reference to plaintiff's ability to do any of the things suggested. That others may possess capacity not possessed by plaintiff, does not help plaintiff. There is no evidence that his ability at the present time is such that he can perform any services for which he could obtain remuneration under his present ability, education and training.

The decision of the Commission should be reversed.