CHARLES v. BYRD.

1. An agreement in writing whereby B rented a plantation from C for five years, containing no clause of forfeiture or provision for a determination upon any act of the lessee *in invitum*, construed to be a lease, which, upon the death of the lessee during the term, vested in his administratrix, notwithstanding covenants providing for acts to be personally performed by the lessee, and forbidding a transfer without the lessor's consent.

2. The terms of this parol agreement could not be added to or varied by parol.

3. This lease having vested in the administratrix by operation of law, she could not surrender it except by "deed or note in writing." *Gen. Stat.*, § 2018.

4. The doctrine of part performance could not apply to a surrender by the administratrix to herself individually, for that would be merely retaining a pre-existing possession; nor could she as administratrix surrender to herself personally this asset of her intestate's estate.

5. Under a writ of *certiorari*, the Circuit Court is bound by the facts found by the trial justice. But the conclusion reached by the Circuit Judge being correct, even under the facts so found, his review of these findings was an immaterial error.

Before Hudson, J., Darlington, January, 1888.

The appeal was from the following decree, omitting its statement:

In the contract of lease I can find no ambiguity, patent or latent. The stipulations are all plainly and clearly expressed, and embrace the usual covenants looking to the enforcement of good husbandry, such as are expected to be, and usually required to be, performed by tenants of farms and plantations; the only special engagement being as to the building of a house on the place, and this is no more than any good tenant is capable of doing or having done. I can see nothing in the terms of the lease which call for parol testimony to aid us in construing it. It is entirely free from ambiguity or obscurity in meaning, but is clear and explicit in all its parts, and explains itself. It is a lease for the term of five years, no more, no less. Had the parties intended that it should terminate upon the death of the tenant, they could easily have so said; but they did not so stipulate. Reading it from beginning to end, and construing it as a whole, we are forced to pronounce it a clear and absolute lease for five years, regardless of the duration of the life of the lessee.

The trial justice therefore erred in admitting parol testimony to explain, alter, or vary the terms of this plain and unambiguous contract. He erred also in concluding that what was thus erroneously admitted really had the effect it was designed to have, for in my opinion it failed in its purpose, and upon the main point,

to wit, the interpretation of the written lease in all its parts, he committed error of law in holding that it terminated upon the death of the tenant, Henry C. Byrd. According to my reading, it is a lease for five years, which, after the death of the lessee before its expiration, enured to the benefit of his estate, and vested in the administratrix.

Counsel for Mrs. Charles argued that this quality of a leasehold estate under the laws of old England is contrary to the nature of our landed estates, and is detrimental to the best interests of our landlords, and hence that leases of land for a term of years should always cease and determine upon the death of the lessee, whether so expressed or not. It is a sufficient answer to this to say that the contrary is the law with us as well as in England. Here, as well as there, leasehold estates survive the intermediate death of either party to the agreement, and vest in the legal representatives of the estate of either. But I do not agree with counsel that it is against the interests of our landlords. This property of a leasehold estate is just as applicable to the condition of things here, and is as beneficial to our landlords and tenants as to those of old England. Upon reason, upon principle, upon convenience and necessity, it is adapted to our interests as well as to theirs. Hence it is the law here just as it is there. Perhaps no case can better illustrate this view than the one under consideration. If the five years' interest in this land acquired by H. C. Byrd in his life-time is valuable, why should not his family, after his premature death, enjoy the benefit of it? The law says they can do so by duly and fully performing the covenants of the lease. On the other hand, if the contract is a good one for Mrs. Charles (and she certainly so considered it at the time of making it), why should she be deprived of its advantages by the premature death of the tenant? The law says that she shall not lose the fruits of the bargain by this event, provided the legal representative of the personal estate of H. C. Byrd can fulfil the agreement, as she is bound to do, and desires to do. But we will cease this line of argument, as we are dealing with the law as it is, and not with the question of its wisdom.

It is very clear that upon the death of H. C. Byrd in January, 1887, this contract survived to his legal representative. Since

that time has she surrendered or forfeited the lease? The trial justice holds that she has done so; but I am forced to say that he has reached this conclusion without evidence sufficient in law to sustain him. Surrender the lease she could not legally do, except by an instrument of writing clearly expressing such intention. No such instrument was executed by her, and no evidence of such was attempted to be introduced. There is no evidence that she has done or said anything that would operate as a forfeiture, or waiver even, of her rights in the premises. Permitting Mrs. Charles to build a house on the place is claimed by counsel of Mrs. Charles to be evidence of a waiver of the five years' lease, and proof of a new agreement. But the law will not allow an act like this, standing isolated and alone, to be construed into so serious a thing as the forfeiture or waiver of a lease for five years.

I have, after listening carefully to the testimony and the argument, read it closely, and feel no hesitation in holding that it not only fails to show surrender, forfeiture, or waiver on her part, but, on the contrary, shows that from the death of her husband to the present time she has been standing to the contract, performing its covenants, and claiming its benefits. It is said that she knew that Mrs. Charles rented the place to Privett and did not object. Certain it is that she did not consent to it, and does not acquiesce in it, and that is enough for her protection. Nor is there any evidence that she made a new contract with Mrs. Charles for 1887. Whether, as legal representative, she can sell and transfer this lease, and whether she can perform its covenants, were questions raised and discussed at the hearing. But these inquiries are not necessary to be answered here, and may be left to be met as the exigency arises. They belong to the future.

The question for me to answer is, did the trial justice commit error in law in adjudging that Sarah Byrd be evicted from the premises in question? If she is in by a valid subsisting lease from Mrs. Charles, then the judgment of eviction is error. I hold that she is in possession lawfully under the lease to her intestate deceased husband, which is still subsisting and of binding force as against Mrs. Charles and any claiming to the con-

trary under her, and that the trial justice erred in the law of the case in holding to the contrary. He was clearly without jurisdiction in evicting one who is in lawful possession of premises under an outstanding valid lease.

It is therefore ordered, adjudged, and decreed, that the judgment of the trial justice be reversed, and the proceedings before him be set aside and dismissed, and that all costs thereof, and of these proceedings in *certiorari*, be paid by Mrs. Caroline A. Charles.

From this decree the landlord, Mrs. Charles, appealed.

*Messrs. Dargan & Dargan*, for appellant.

The agreement construed as a whole and in the light of its several clauses shows that Mrs. Charles was depending upon the personal qualities of Byrd, and that he only should be the lessee. 1 *Speer*, 395; *Bish. Cont.*, 380, 384; 2 *Pars. Cont.*, 501, 513; 1 *Ibid.*, 506; 2 *Wash. Real P.*, 23, 24; 2 *Bl. Com.*, 125. The parties have given a practical construction sustaining this view. *Bish. Cont.*, 412. The findings of fact by the trial justice are irreversible. 24 *S. C.*, 520. No part of this agreement was added to or varied by parol testimony—only the situation of the contracting parties was so proved, and this is permissible. 2 *Pars. Cont.*, 500; *Bish. Cont.*, 372, 375. Mrs. Byrd has forfeited and surrendered the lease by her acts. 1 *Wash. Real Prop.*, 351, 352, 363.

*Messrs. Nettles & Nettles*, contra.

November 27, 1888. The opinion of the court was delivered by

MR. JUSTICE McIVER. Some time prior to the 1st day of January, 1887, the precise date not being stated, the appellant and one H. C. Byrd entered into a written agreement, of which the following is a copy:

"The following agreement has been made between Mrs. C. A. Charles on the one part, and Mr. H. C. Byrd on the other:.

"1. Mrs. Charles agrees to rent to H. C. Byrd for five years from January 1st, 1887, her plantation on Back Swamp, except

twenty acres reserved for the use of Philip Backus, on the following terms:

"2. Mr. Byrd agrees to see that all land cultivated on the plantation is well cultivated and well fertilized, so as not to deteriorate in value, and all cotton seed made on the land are to be used in fertilizing it, so long as he rents it.

"3. Mr. Byrd agrees to carefully watch the timber and see that it is not wasted nor depredated upon, and the timber trees not cut for fuel, and no land shall be cleared without Mrs. Charles's consent.

"4. Mr. Byrd agrees to keep the buildings in good repair, to keep the gin gearing protected from injury and from exposure to the weather, to build a gin house at some other place than the present one occupies, and at a sufficient distance from all other buildings not to endanger them or for it to be endangered by fire, at such place as Mrs. Charles shall prefer.

"5. Mr. Byrd agrees to build a house and start a settlement at such other place on the plantation as Mrs. Charles may prefer.

"6. Mr. Byrd agrees to furnish material, such as timber for frame, lumber (including a sufficient quantity for making necessary partitions and for ceiling overhead), and shingles, all to be placed by him on the site selected for a house, not to exceed in dimensions 36 feet by 46 feet, with a piazza in addition, also to have the necessary brick for two chimneys and pillars to the same.

"7. Mr. Byrd agrees to plant, cultivate, and bank for Mrs. Charles a half acre in potatoes, and deliver the same as desired.

"8. Mr. Byrd agrees to deliver to Mrs. Charles each year twelve bales of lint cotton, averaging five hundred pounds each, packed and prepared for market, and delivered at Darlington C. H.

"9. Mrs. Charles agrees to allow Mr. Byrd to deliver to her every alternate bale of cotton, provided the crop will warrant the arrangement; but in no instance does she waive her right to the full amount of rent.

"10. Mrs. Charles agrees to allow Mr. Byrd the use (so long as he remains on the place) of the cotton seed out of thirty-two bales of cotton, averaging five hundred pounds each, returned to her by Mr. W. H. Rose, and at the close of his lease the same quantity of seed shall be left by Mr. Byrd.

"11. This lease is not transferable without Mrs. Charles's consent.

"Mr. Byrd agrees to send potatoes when he can conveniently do so."

Under this agreement Byrd went into possession of the land,

but very soon after, some time in the month of January, 1887, he departed this life intestate, leaving his widow, Sarah Byrd, the respondent herein, and several children. On the 22nd of March, 1887, letters of administration upon his personal estate were duly granted to the said Sarah Byrd, and she continued in possession of the premises. On the 31st of December, 1887, at the instance of appellant, a trial justice issued his summons or notice to quit, requiring the respondent herein to show cause, within three days from the personal service of said notice, why she should not be ejected from the said premises. Respondent showed for cause the facts above stated, and claimed that by operation of law the lease of said premises had vested in her as administratrix of the lessee, and that she was entitled to hold possession of the same for the remainder of the said term of five years.

At the hearing before the trial justice, counsel for Mrs. Charles was permitted to introduce testimony, objected to by counsel for respondent, tending to show that the lessee, H. C. Byrd, was possessed of peculiar qualities which rendered him an especially desirable tenant, with a view to aid the construction of the written agreement for which he contended, to wit, that it was a purely personal contract and terminated with the death of the said H. C. Byrd. Testimony was also received for the purpose of showing that after the death of H. C. Byrd the respondent had agreed to rent the premises for the balance of that year; but this testimony rested altogether in parol, as there was no pretence that there was any writing to that effect.

The trial justice rendered his decision as follows: "That on the    day of      , 188  , the said Caroline A. Charles and Henry C. Byrd entered into an agreement for the rent of the place of the said Caroline A. Charles for five years, commencing on the 1st day of January, 1887; that on the    day of January, 1887, the said Henry C. Byrd departed this life, which, in my judgment, terminated and determined the said contract; that afterwards Sarah Byrd entered into an agreement with the said Caroline A. Charles for the rent of the said place for the balance of the year 1887, not as administratrix of Henry C. Byrd, but as Sarah Byrd personally and individually, and which contract terminated

on the 31st of December last; that the said Caroline A. Charles, confidently relying upon the understanding she had with said Sarah Byrd as to the time and termination of her tenancy, rented the said premises to Joseph E. Privett for five years, commencing January 1st, 1888." He therefore adjudged that the respondent herein be ejected from said premises, and issued his warrant to the sheriff for that purpose, who was proceeding to execute it when his further proceeding was arrested by an order from his honor, Judge Hudson, to whom an application for a writ of *certiorari* had been made and granted.

Upon hearing the return to this writ, Judge Hudson reversed the decision of the trial justice, and rendered judgment dismissing the proceedings for the ejectment of the respondent herein, with costs. From this judgment Mrs. Charles appeals upon the several grounds set out in the record, which raise substantially the following questions: 1st. As to the nature and legal effect of the written agreement, a copy of which is set out above. 2nd. Whether the parol evidence offered on the part of appellant was competent. 3rd. Whether the alleged agreement by Mrs. Byrd to rent the premises for the balance of the year 1887 amounted to a surrender of the original lease. 4th. Whether the findings of fact by the trial justice should have been accepted as final under proceedings in *certiorari.*

It is quite clear that the paper in question must be regarded as a lease for a term of years, for it contains all the elements necessary to constitute such an instrument. The time of its commencement, its duration, and the amount of the rent reserved are all expressly specified in the paper; and by it the lessor divested herself of possession, and the lessee was let into possession under it. The very first stipulation is that Mrs. Charles "*agrees to rent* to H. C. Byrd for five years from January 1st, 1887," the premises in question, and the paper, in two places, is expressly designated as a "lease." There is not a word in the agreement which would indicate that it was a contract for the personal services of H. C. Byrd to be rendered by him to Mrs. Charles, on her plantation, under her direction and control. In this respect the case differs materially from *Maverick* v. *Lewis & Gibbes* (3 McCord, 211), where Hunter was the mere employee

of Maverick, and from the case of *Huff* v. *Watkins* (15 S. C., 82), where Butler was a farm laborer or servant entitled to a share of the crop for his services, bound to work under the exclusive management and control of his employer. Nor is it like the case of the *State* v. *Page* (1 Speer, 408; 40 A. D., 608), where Page was employed to keep a hotel at a certain specified compensation, to be increased to certain other sums if the profits of the concern exceeded certain specified sums; though it may be mentioned that even the agreement in that case seems to have been regarded by the Court of Equity as a lease. *City Council* v. *Page*, Speer Eq., 159.

If, then, this agreement must be regarded as a lease for a term of years, creating a leasehold estate, in the lessee, it is well settled that, upon the death of the lessee during the term, such estate vested in his executor or administrator, as the case may be, unless there is some provision in the lease stipulating for its termination upon the happening of such an event (1 *Wms. Exors.*, *462); and this doctrine has been expressly recognized in this State. *Payne* v. *Harris*, 3 Strob. Eq., 39. It cannot be claimed that there is in this lease any *express* stipulation that it shall terminate upon the death of the lessee, but it is earnestly contended that such an intention must be implied from the terms of the agreement, looked at as a whole, and especially from the terms of the 10th and 11th clauses thereof. Looking at the provisions of this agreement as a whole, it does not seem to us that they are of such a character as necessarily to imply that the lessor bargained only for the personal services of the lessee, and that when he was no longer capable of rendering such services *personally* the contract should terminate. The character of these provisions are such as are not unusual in leases, the object of their insertion being to secure good husbandry and a proper care of the premises. The services stipulated for on the part of Byrd—to see that the land was well cultivated and fertilized, the cotton seed used for that purpose; to see that the timber was not wasted or depredated upon; to keep the buildings in good repair and the gin gearing protected from the weather; to build a gin house at a sufficient distance from other buildings to be secure from fire "at such place as Mrs. Charles shall prefer;" to build a house

and start a settlement "at such other place on the plantation as Mrs. Charles may prefer;" to furnish material, such as timber, &c., for such house; to cultivate potatoes for Mrs. Charles, and to pay the rent specified—it seems to us are all of such a character as any other good tenant might perform, either by himself or by the employment of others, and do not necessarily imply that they could have been performed by Byrd only.

Nor do we think that the provisions in the 10th clause of the agreement that Byrd was to have the use of certain cotton seed "so long as he remains on the place," and that the same quantity should be left on the place "at the close of his lease," necessarily implies that the lease was to terminate upon his death. On the contrary, it seems to us that these two expressions—"so long as he remains on the place," and "at the close of his lease," taken together, as they should be, imply that as long as the lease continued, Byrd, or his executor or administrator, as the case might be, would be entitled to the use of the seed, with an obligation to return the same at the close of his lease. For, as we understand it, a lease for years to A, without naming executors or administrators, would, by operation of law, upon his death vest in his executor or administrator, and no words of limitation could alter the succession. "Thus if a lease for years be made to a man and his heirs, it shall not go to his heirs, but his executors." 1 *Williams on Executors*, *464, citing *Co. Litt.*, 46*b*. Hence this lease must be construed as a lease to Byrd, his executors or administrators.

We come next to consider the effect of the 11th clause of the agreement, which provides that the lease shall not be transferable without the consent of Mrs. Charles. It will be observed that there is no provision in the agreement by which the breach of any of its covenants shall work a forfeiture of the lease or determine its duration by limitation or otherwise, and therefore a question might be raised whether a failure on the part of the lessee to comply with any of the stipulations would work a forfeiture or operate as a limitation upon the duration of the lease, or would simply subject the lessee to an action for damages for a breach of his covenant. But waiving that question, and assuming that a breach of the provisions of the 11th clause, by an alien-

ation of the lease, would either work a forfeiture of the lease, or determine its duration by way of conditional limitation, the question still remains whether the mere fact that by the death of the lessee the lease has descended to and become vested in his administratrix by operation of law, is such an alienation as would effect that result. In 2 *Williams on Executors,* *676, it is said: "If a lease be made for a term of years *upon condition* that if the lessee shall assign his term without the assent of the lessor, it shall be lawful for the lessor to re-enter, the term shall nevertheless vest in the executor or administrator of the lessee, without any breach of such condition." And in a note to *Philpot* v. *Hoare* (2 Atk., 219), it is said, upon the authority of several cases there cited: "It seems settled that the mere act of a lease vesting in an assignee by operation of law (such as executors, administrators, &c.), can never be considered as a forfeiture under the proviso or covenant not to assign; for if such act of vesting should be considered a breach, the lease must, in fact, determine by the death of the lessee, which could never be the intention of the parties unless so particularly expressed."

In fact, the rule in England is that a covenant not to assign or transfer a lease is not broken by any alienation *in invitum,* as by a decree in bankruptcy or by a judgment, unless it is shown that such alienation was procured by the voluntary act of the lessee, though the lessor may, by an express stipulation to that effect, provide against even an alienation *in invitum.* *Doe* v. *Carter,* 8 T. R., 57; *Seers* v. *Hind,* 1 Ves., 294; *Roe* v. *Galliers,* 2 T. R., 133; *Roe* v. *Harrison, Ibid.,* 425. And there is high authority in this country also for this doctrine. *Jackson* v. *Corliss,* 7 Johns., 531; *Smith* v. *Putnam,* 3 Pick., 221. Where, however, as in *Doe* v. *Hawke* (2 East, 481), a testator gave by his will his tenant-right, held under a lease, to A., "but not to dispose of or sell it; and if he refused to dwell there, or keep it in his possession," then that the tenant-right should go over to J., and A. having borrowed money, left the title deeds with his creditor as a security, and confessed a judgment, and having also given a judgment to another creditor who issued execution, under which the sheriff sold the lease, and A. having left the place and ceased to dwell there on the day of the execution

before the sheriff entered, it was held that the remainderman J. was entitled to enter, the estate of A. having terminated by his acts. The main ground of the decision seems to have been that the estate of A. was limited to the time of his actual occupancy of the premises, and that when he ceased to dwell there, the conditional limitation over to J. took effect, the prior estate to A. having terminated; though some of the judges seemed to think that the alienation, though in one sense *in invitum,* was really voluntary and brought about by the procurement of A.

So in *Doe* v. *Clarke* (8 East, 185), where the lease was for 21 years, "if the said T. Clarke and his executors, &c., should so long continue to inhabit and dwell with his and their family and servants in the said farm house, and he and his executors, &c., should so long continue actually to hold and occupy the said farm lands and premises, and not let, set, assign over, or otherwise depart with this present lease, or the farm and premises, or any part thereof, to any person whatever," with a proviso that if any of the covenants should be broken, the lease should cease and be void, and the lessor might re-enter, it was held that upon the sale of the premises to a third person, under proceedings in bankruptcy, that the estate of the lessee, Clarke, terminated by the express terms of the lease, which was in effect a lease for 21 years, *if* Clarke should continue to actually occupy the premises for that length of time, and that upon his ceasing so to do the lease terminated by its express terms.

Indeed, counsel for appellant concedes that in England, as well as in several of our sister States, the rule is that a covenant in a lease for years not to assign, is not broken by a transfer *in invitum,* as by decree in bankruptcy or by the death of the lessee, unless there is some express provision to that effect in the lease; but he earnestly insists that, as no rule upon the subject has ever been established in this State, we should not follow the English rule, but adopt one which would be more in conformity with what he claims to be the very different conditions which exist here from those found in England, in respect to the landed interest and agricultural condition of the two countries. His argument is necessarily based upon what we regard as the unwarranted assumption that the rule in England was derived from

considerations growing out of its agricultural policy and its landed interest. We find nothing in any of the authorities which would indicate that the rule was founded upon, or had its origin in, any such considerations. On the contrary, it seems to us that the rule resulted from the general principles of law which prevail here as well as in England, in relation to the nature and incidents of that species of property to which the rule relates. There as here leasehold estates are regarded as personal property, and upon the death of the lessee go to the executor or administrator, as the case may be, whether the executor or administrator be mentioned in the lease or not. Hence when a lease is made to A, without adding the words "his executors," &c., the law there as well as here regards it as a lease to A, his executors or administrators, and hence a covenant in such a lease not to assign could not, without a contradiction in terms, be regarded as broken by the transfer of the estate to the executor or administrator by the death of the lessee.

So, too, in regard to any other mode of alienation or transfer *in invitum*, the law there, as well as here, contemplates the liability of every one to be overtaken by insolvency, which would result in the involuntary sale of his property, and hence a general stipulation in a lease not to assign is regarded there, and should be here, as a stipulation not to do a *voluntary* act—a thing which he can refrain from doing, and not a stipulation that something over which he has no control shall not be done. Such a provision in a lease is, and ought to be, regarded as a restraint upon the *voluntary* action of the party bound by it, and not as a restraint upon action over which the party so bound has no control. But if the lessor desires to prevent an alienation or transfer of any kind, whether voluntary or involuntary, it is perfectly competent, as it was held in *Roe* v. *Galliers, supra*, for him to do so by inserting an express provision to that effect in the lease; but in the absence of any such express provision, a general covenant that the lease shall not be assignable will not be regarded as broken by an alienation *in invitum*, but only by a voluntary transfer. It seems to us, therefore, that the principles upon which the English rule rests are equally applicable here, and that the rule itself should be recognized. here.

An examination of the terms of the lease now under consideration show that, though the various stipulations and covenants on the part of the lessee are carefully and even minutely specified, there is an utter absence of any provision for the forfeiture of the lease by the breach of any of its covenants, or of any provision restraining an *involuntary* transfer, or any stipulation that the lease should terminate from any cause before the expiration of the term expressly provided for its duration. There is no provision, as in *Doe* v. *Hawke, supra*, that if the lessee "refuses to dwell" on the premises, they shall go over to a third person or revert to the lessor, nor, as in *Doe* v. *Clarke, supra*, that the lease should be for the specified term of years, "*if the tenant * * should so long continue to inhabit and dwell with his family* in the farm house, * * and should *so long continue actually to hold and occupy* the *said farm*," &c. In fact, there is no express stipulation that the lessee should actually occupy and dwell on the premises himself, and he might have lived elsewhere and complied with every stipulation of the contract. The only provision in the agreement which seems to contemplate that the lessee should actually reside on the premises is that contained in the 10th clause, whereby he was to have the use of certain cotton seed "so long as he remains on the place," to be returned, be it observed, not when he left the actual occupation of the premises, but "at the close of the lease." Now, when it is remembered how common it is for persons to rent land which they are not expected to reside on, and when we find no stipulation to that effect in this lease, we cannot conclude that the lease was either forfeited, or that it terminated when the lessee was removed by death from the actual occupancy of the premises.

It is insisted, however, that the parol evidence which was ruled out by the Circuit Judge was sufficient to show "that in making this contract the lessor bargained for the exercise of the personal skill, judgment, and fidelity of the lessee in the execution of his part of the agreement." We must, therefore, consider the competency of such evidence. It seems to us that the only effect of this evidence, if received, would be to incorporate additional stipulations into the agreement, which was in writing, whereby the lease should be forfeited or be terminated by its own limitation,

so soon as the lessee ceased from any cause to actually occupy the premises and give the same his personal supervision. For such a purpose it is quite clear that parol evidence is incompetent, as is clearly shown by the Chief Justice in *Railway Company* v. *Seigler*, 24 S. C., at pages 128 and 129. It may be, and doubtless was, the fact that Mrs. Charles supposed that she was securing a valuable tenant, and that she relied largely upon his personal skill, judgment, and character for the performance of the covenants on his part, and it may be even that her intention was to confine the lease to Mr. Byrd personally, but as she neglected to insert such a provision in the agreement, there is nothing to show that the other party concurred in such intention or would have assented to such a provision. As the Chief Justice well says, in the case just cited : "The parties themselves having reduced their contract to writing, they are supposed to have done so, in part at least, with a view to exclude everything else but the writing itself in determining their contract." No matter, therefore, what may have been the intention of one of the parties, even though it may have been expressed orally at the time, yet if it was omitted from the written contract, it cannot afterwards be incorporated therein by any parol evidence.

Having determined that the lease was neither forfeited nor terminated by its own limitation by the death of Byrd, our next inquiry is whether it was surrendered by his administratrix after his death. There is no pretence that the alleged surrender was made "by deed or note in writing," and this would seem to be conclusive, for section 2018 of General Statutes provides as follows : "No leases, estates, or interests, either of freehold or term of years, or any uncertain interest of, in, to, or out of any lands, tenements, or hereditaments, shall at any time be assigned, granted, or surrendered, unless it be by deed or note in writing, signed by the party so assigning, granting, or surrendering the same, or his agent thereunto lawfully authorized by writing, or by act and operation of law." So that accepting the finding of fact by the trial justice as final (which, we think, under the case of *State ex rel. Sawyer* v. *Fort*, 24 S. C., 510, the Circuit Judge was bound to do, under a writ of *certiorari*), to wit, "that afterwards (meaning after the death of H. C. Byrd) Sarah Byrd entered

into an agreement with the said Caroline A. Charles for the rent of the said place for the balance of the year 1887, not as administratrix of Henry C. Byrd, but as Sarah Byrd personally and individually," this would not operate as a surrender of the original lease, because it was not "by deed or note in writing."

But if it should be contended that in analogy to the numerous decisions which have been made on the succeeding section of the statute of frauds (General Statutes, section 2019) in regard to contracts for the sale of lands, that they will be taken out of the operation of the statute by part performance of the contract, the answer is, that there was no such part performance here.    Mrs. Byrd did not go into possession under the alleged contract to rent to her individually, but she merely retained possession of what had previously fallen to her by the death of her husband, and the rule is that the mere retention of a pre-existing possession is not sufficient.   *Poag* v. *Sandifer*, 5 Rich. Eq., 179 ; *Boozer* v. *Teague*, 27 S. C., 348.    Besides this, we do not see by what authority Mrs. Byrd could surrender a lease to her intestate and take one to herself "personally and individually," for it is not to be supposed that she would take such lease unless she regarded it as an advantageous one, and this, as administratrix, she would not be authorized to do ; for this would be allowing her to take advantage to herself at the expense of the estate committed to her charge.    So that, in no view of the case, can the alleged surrender be regarded as valid.

The only remaining question is, whether under a writ of *certiorari* the Circuit Judge could review the findings of fact by the trial justice.    As we have already said, upon the authority of the case cited, we think he was confined to a review of errors of law only ; but this question becomes immaterial in this case, because, as we have seen, that even accepting the findings of fact by the trial justice, the conclusion as well as the judgment below was correct.

The judgment of this court is, that the order and judgment appealed from be affirmed.