218 S.C. 322 (1950)
62 S.E.2d 780
PETTIFORD
v.
SOUTH CAROLINA STATE BOARD OF EDUCATION.
16445
Supreme Court of South Carolina.
December 15, 1950.
*323 *324 Messrs. C.T. Graydon and John Grimball, of Columbia, for Appellant.
Messrs. John M. Daniel, Attorney General, T.C. Callison and R. Hoke Robinson, Assistant Attorneys General, *325 of Columbia, and J. Means McFadden, of Chester, for Respondent.
The following is the opinion of Judge Greneker, in the Court below.
The above-entitled matter came before me to be heard on the petition of the above-named petitioner, asking for a Writ of Certiorari and Supersedeas, and praying that the action of the South Carolina State Board of Education revoking her certificate to teach in the public schools of South Carolina be reversed, and that she be restored to her former status and permitted to continue to teach in the public schools of South Carolina.
A hearing on this petition was held before me in Columbia on November 21st and 22nd, at which time the facts and circumstances out of which this matter arose were gone into and developed in detail, and the evidence was carefully considered.
Counsel for both parties agreed that I should consider this matter on its merits, and the record and exhibits prayed for in the 10th paragraph of the petition, as well as some additional exhibits, were all introduced in evidence for my consideration at the hearing, and have been carefully considered by me.
*326 While the facts upon which this proceeding is based are rather lengthy and involved, its importance to the State of South Carolina, and also the number of individuals that may be affected, seem to require that they should be set out in some detail.
In the teacher certification program in South Carolina, yearly teacher examinations, designated National Teacher Examinations, are held at various places in this State. The last such examination was held on February 19th, 1949. The questions contained in these examination are complied, edited and published by an organization known as the Educational Testing Service, whose principal office is in Princeton, New Jersey, and the evidence discloses that no one in South Carolina has any part in the preparation of these examination questions. Some time prior to February 19th, 1949, these examination questions, contained in three booklets, with separate sheets upon which the answers to these questions were to be recorded, special pencils known as "electrographic" pencils, and certain score cards and possibly other material, were shipped from Princeton, New Jersey, to Dr. McColl, of the School of Education of the University of South Carolina, who is the administrator in charge of managing the details of conducting this National Teacher Examination in South Carolina. This examination material was packaged to conform to the predetermined number of those who were to take the examination in each room where it was to be given, and all the material was in sealed packages. Dr. McColl kept this material in its original sealed-package state in a store room at the University of South Carolina, in Columbia, until Wednesday and Thursday before the examination, which was given on Saturday, when he called in the local administrative heads of the examination, designated. "local examiners", to get the examination material to be used at their respective local centers. These local examiners were furnished room lists, showing the names and numbers of the individuals who had registered to take the examination who were assigned to particular rooms at the *327 places where these local examiners were to conduct the examination, and these examiners thereupon broke the seals of the packages, checked the examination material against these room lists and, upon verifying the fact that they each had the correct and proper material, replaced it in the packages and resealed them. Each local examiner then took his material and kept it until Saturday morning, February 19th, when it was taken to the local examination centers, and distributed to those taking the examination.
Just prior to the examination, a rumor or report was circulated that there might be efforts made to use unlawful or fraudulent aid by some of those taking the examination, with the result that those in charge of conducting the examination were warned to be alert to discover any such improper attempts. In each room where the examination was held, there was a designated "room examiner" in charge of such room, with one monitor or proctor for each thirty examinees, or fractional part of thirty, in the room, to assist the room examiner.
In conducting the examination, question booklet number I was first distributed, with its corresponding answer sheet; after the lapse of a prescribed period of time, booklet number I and answer sheet number I were collected and question booklet number II and answer sheets number II were distributed; then, after the lapse of the designated time, booklets number II and answer sheets number II were collected and booklets number III and answer sheets number III were distributed; and finally, when the allotted time for the entire examination had expired, booklets number III and answer sheets number III were collected. The question booklets were then checked, enclosed in sealed packages, and shipped by express direct from each examination center in this State to the offices of the Educational Testing Service, in Princeton, New Jersey, and the answer sheets, containing the examinee's answers to the questions contained in the examination, were enclosed in sealed envelopes, and sent by first class mail to the same organization in Princeton.
*328 These answer sheets, which the average layman would normally refer to as examination papers, were scored or graded by the Educational Testing Service, in Princeton, and no one in South Carolina had any part in grading them.
The National Teacher Examination is composed of questions, slightly more than six hundred, which are described as "multiple choice" questions. Each question has a number of suggested answers, generally five, from which the examinee chooses and marks the one which, in his opinion, is correct. There is but one correct answer to each question, leaving, in most subdivisions of the examination, four incorrect answers to each. The answer sheets issued to the examinees, corresponding to the question booklets, had the number of choices of answers to each question indicated for each question, and the examinees indicated their choices with the electrographic pencils distributed to them. These pencils were so described because of the fact that their leads contained a high content of electricity-conducting material.
When the answer sheets, or examination papers, of those taking the examination in South Carolina were received by the Educational Testing Service, in Princeton, New Jersey, from the individual examination centers in South Carolina, they were then graded or scored by said Educational Testing Service in accordance with its general procedure. These examination papers are graded or scored by machines, and the evidence discloses that the manner of grading these papers is by constructing a master correct stencil, or answer sheet, in which the correct answer to each question is punched, or perforated, and then the answer sheets or examination papers of those taking the examination were compared with this master correct answer sheet, or stencil, by electrical impulses. Where the examinee answered the question correctly, by choosing the correct answer, the machine would indicate a correct answer, and where the examinee gave an incorrect answer, the machine, by electrical impulse, would also show that the examinee had answered a question incorrectly. These machines make no calculations whatsoever *329 for omissions, and these omissions are not considered in computing the scores which the examinees made upon the examination. It appears that what these educational testing experts term "raw scores", which are the bases for arriving at the grades made by the examinees on the subdivisions of the examination, are computed by taking the number of correct answers and subtracting from that number the number of incorrect answers divided by the number of ways in which each question could have been answered incorrectly. After these raw scores, which represent the total number of correct answers less a fractional part of the incorrect answers, have been computed, they are then reduced to what are designated "scale scores", and these scale scores are the marks, or grades, which are reported to have been made by the examinees upon the examination. The evidence shows that each examinee's examination paper is run through not less than two or three scoring machines, to be certain that the examination papers are graded, or scored, correctly, If the two machines coincide identically, then it is assumed that that particular paper has been graded correctly. If there is any discrepancy between the grades indicated by the two machines, then the papers are run through a third machine and then sometimes the final grading is done by an individual employee of the Educational Testing Service comparing this particular examinee's examination paper with the correct master answer sheet. After the examination papers from South Carolina were graded, or scored, by the Educational Testing Service, in Princeton, the grades made by the respective teachers were reported to the teachers in South Carolina who took this examination directly from the Educational Testing Service, and copies of these grades were sent to the South Carolina Department of Education.
When the National Teacher Examination was conducted in South Carolina, on February 19th, 1949, the room examiners, monitors and proctors had been warned to be particularly alert to detect any one's attempting to use illicit or fraudulent aid or assistance while taking the examination, *330 in view of the rumors that attempts to use such aid and assistance would be made which had circulated prior to the examination, hereinabove mentioned. While the examination was in progress, room examiners and proctors perceived several of those taking the examination using, or attempting to use, such aid and assistance, and these room examiners and proctors confiscated the material that these examinees were using, or attempting to use, for their aid and assistance in answering the questions contained in the examination. In all, some seven different instruments, containing, or purporting to contain, the answers to a considerable number of the questions contained in this National Teacher Examination were confiscated from individuals who were taking the examination. These instruments, generally referred to as "fraudulent keys", were confiscated from various places in this State. Some of these documents, or fraudulent keys, were rather complete instruments, and covered most of the sections contained in the examination, while other of these fraudulent keys contained two or three sections of the examination only. These fraudulent keys were delivered to Dr. McColl, of the University of South Carolina, the following day; and, upon examining them, Dr. McColl perceived, according to his testimony, that they were answers, or purported answers, to certain of the questions contained in the examination. He then, individually, made copies of each of these seven instruments, or fraudulent keys, and mailed them to the Educational Testing Service, in Princeton. The Educational Testing Service took these seven instruments, and, upon examining them, determined that they were actually fraudulent aids, or keys to parts of the examination. One significant feature of these instruments is that, where the content was similar with reference to subdivisions of the examination covered, the information contained under those subdivisions was practically identical. In other words, if two of these instruments purported to answer the same sections of the examination, the information contained under those sections was almost identically *331 similar; the variation between these various instruments being so small as to be practically negligible, and such as might easily have resulted from a mistake or mistakes in transcribing.
Having determined that these seven instruments were fraudulent aids, or keys for assistance of those taking the National Teacher Examination, in 1949, the Educational Testing Service, at the request of the South Carolina Board of Education compared the examination papers of every teacher who took the examination in South Carolina with the fraudulent key. The Educational Testing Service took the seven fraudulent keys, and from their content prepared what was designated as a composite or master fraudulent key. This master fraudulent key represents the content of the seven fraudulent instruments confiscated from those taking the National Teacher Examination in South Carolina, and was prepared by copying the subject-matter of the seven fraudulent keys so confiscated. In those rare instances where there was a variation between the various seven fraudulent keys, the Educational Testing Service took that purported answer which was contained in the majority of the fraudulent keys. The seven fraudulent keys covered, in whole or in part, every section contained in the National Teacher Examination with one exception; the one portion not covered by the fraudulent key being that subdivision designated Verbal Comprehension, Part I.
Having prepared this master or composite fraudulent key, the Educational Testing Service then cut a stencil, to be used in its scoring or grading machines, for the purpose of comparing this master fraudulent key with all examination papers from teachers in South Carolina who took the examination in 1949. This stencil was cut to show the answers contained in the fraudulent key regardless of whether they were correct or incorrect. When the examination papers from South Carolina were run through these scoring or grading machines, the comparison with this master fraudulent key would indicate the extent, if any, to which these *332 examination papers corresponded to this key. In all there were some four thousand eight hundred papers from South Carolina compared with this fraudulent master key, and this comparison indicated that somewhat more than six hundred of the papers from South Carolina corresponded to this master fraudulent key to such extent as to indicate that there was more than accidental or coincidental correspondence. Every examination paper from South Carolina, whether the examinees were white or colored, was compared with this master fraudulent key. It is self-evident that these grading or scoring machines would have no idea of the identity of the examinee whose paper was being compared with the master fraudulent key.
After having compared all papers from South Carolina with this master fraudulent key, the Educational Testing Service then deemed it advisable to compare examination papers from other States, and particular stress was given to papers from examination centers around Augusta, Georgia, Charlotte, North Carolina, and examination centers from States like Virginia, North Carolina, Georgia, Florida, Tennessee, Alabama, and other States in the general vicinity of South Carolina. Also, inasmuch as the principal offices of the Educational Testing Service are in Princeton, New Jersey, it was deemed advisable to compare sizable numbers of papers from New Jersey, New York and Pennsylvania with this master fraudulent key. In addition, samples were taken from practically every State in the United States and compared with this master fraudulent key.
As a result of all of these comparisons, the Educational Testing Service ascertained that only in South Carolina were there examination papers that corresponded in any degree of any consequence to this master fraudulent key, and that there were only somewhat more than six hundred papers in South Carolina that did correspond to this master fraudulent key to a marked degree. Upon taking the names of those whose papers corresponded to such marked degree to this master fraudulent key, it was ascertained that all of them *333 were Negroes who had taken the National Teacher Examination at various examination centers in South Carolina.
In preparing this list of those whose examination papers corresponded to such marked degree to the master fraudulent key as to clearly indicate that those examinees must have used a fraudulent key in preparing their answers, the Educational Testing Service gave the examinees the benefit of doubt and the evidence shows that, in those instances where the similarity was not so great as to preclude doubt, the Educational Testing Service dismissed that examinee from suspicion of having used the fraudulent key.
When this matter was heard before me, there was presented in evidence the complete record of the hearing of Julia Pettiford upon a Rule to Show Cause as to why her certificate should not be revoked, a certified copy of her answer sheet or examination paper, a certified copy of the master fraudulent key, a certified copy of the correct master key, showing the correct answers to each question contained in the examination, and the seven fraudulent instruments, or keys, which were confiscated from individuals taking the examination while in the act of using, or attempting to use, such instruments or keys. An inspection of this master fraudulent key revealed that it is by no means complete. There were ten large subdivisions of the National Teacher Examination; and, as above stated, there is no key at all for Part I of Verbal Comprehension. In other sections, the fraudulent key does not purport to answer every question, but omits varying numbers in the various sections. Also, the answers contained in the fraudulent key are not always correct and, in a number of sections, there are almost as many incorrect answers as there are correct answers The section entitled Child Development and Educational Psychology had sixteen questions answered correctly, fifteen questions answered incorrectly, and fourteen questions omitted. No questions were covered by the fraudulent key after question 36. The section entitled History, Literature and Fine Arts contained ninety *334 questions, but the fraudulent key purported to answer forty of those questions only, answering twenty-three of them correctly and seventeen incorrectly. The manner in which this fraudulent key answered incorrectly, omitted and stopped furnished a rather definite pattern to which the examination papers from South Carolina could be compared. Particularly significant were the incorrect answers set out in the fraudulent key; for, in all but one or two sections, there are four incorrect answers to each question contained in the examination, and it is difficult to conceive just how or why an examinee choosing the incorrect answer should choose that one of the four incorrect answers which was contained in the fraudulent key with any substantial regularity.
There were a number of circumstances which indicated the use or nonuse of the fraudulent key, which may be summarized briefly, as follows:
(1) The correspondence of correct answers in an examinee's paper to the correct answers contained in the fraudulent key;
(2) The correspondence between incorrect answers in an examinee's paper to the incorrect answers in the fraudulent key, and particularly whether the incorrect answers corresponded in the same identical manner of answering incorrectly;
(3) The correspondence between omissions in an examinee's paper and the omissions in the fraudulent key;
(4) The correspondence between stopping points in the sections of an examinee's paper and stopping points in corresponding sections of the fraudulent key; and
(5) Scores made by an examinee on those sections where there was a marked and substantial degree of correspondence to the fraudulent key and scores made on those sections where there was no correspondence of any consequence to the fraudulent key.
*335 Having determined, in the opinion of its officers and employees, that there were somewhat more than six hundred examinees in South Carolina whose examination papers corresponded to such extent to the fraudulent key as to indicate the use of a similar instrument by such examinees when taking the examination, the Educational Testing Service advised the South Carolina State Board of Education and Department of Education of the names of those on this list, with the result that numerous proceedings, similar to the one now before me, were instituted in this State. The powers of the State Board of Education, insofar as they are pertinent to this proceeding, are concerned and are as follows: "The State Board of Education shall have power: * * * (4) to grant state teachers' certificates and to revoke them for immoral or unprofessional conduct, profanity or evident unfitness for teaching". From this, the State Board of Education has power to grant teachers' certificates, and to revoke them, under the statute, for cause: those causes being immoral or unprofessional conduct, profanity or evident unfitness for teaching.
On August 17th, 1949, the petitioner herein was served with a Rule to Show Cause, directing her to appear before the State Board of Education on August 24th, 1949, to show cause why her State Teachers' Certificate should not be revoked; the grounds for such proposed revocation being that she had been guilty of immoral or unprofessional conduct, or was evidently unfit for teaching by reason of the fact that she had secured certain information in the from of answers to questions contained in the National Teacher Examination, which examination she took in Columbia, South Carolina, on February 19th, 1949, and used such information for her aid and assistance in taking the examination, to cheat upon said examination, and to obtain a higher score or grade upon said examination than she herself was naturally capable of earning, by reason of her knowledge and intelligence.
*336 Pursuant to this Rule to Show Cause, the Petitioner herein appeared before the State Board of Education, on August 24th, 1949, at which time a hearing was held in connection with her alleged cheating upon the National Teacher Examination. The facts which I have stated hereinabove were developed from individual witnesses, and then a Mr. Crane, who is an employee of the Educational Testing Service, and engaged in educational testing work, was called as a witness to compare the examination paper, or answer sheet, of the petitioner herein with the master fraudulent key. It might be well to state that, at this hearing, the petitioner herein was well and capably represented by counsel throughout the proceedings.
In comparing the examination paper of this petitioner with the master fraudulent key, the following facts were established: In the section of the examination entitled Child Development and Educational Psychology, there were forty-five questions. The fraudulent key started with question one and concluded with question thirty-six; and, of these thirty-six questions covered by correct answers, incorrect answers and omissions, it had sixteen answered correctly, fifteen answered incorrectly, and five omissions. Of the sixteen correct answers in the fraudulent key, this petitioner had fifteen of those sixteen answered correctly; of the fifteen incorrect answers in the fraudulent key, this petitioner answered thirteen of those fifteen incorrectly, and incorrectly in the same identical manner, although she might have answered any one of those thirteen questions incorrectly in four different ways; and, of the five omitted between questions one and thirty-six, this petitioner omitted three of those five which the fraudulent key omitted. Of the nine questions remaining in that section beyond where the fraudulent key ended, this petitioner attempted five of those nine, getting one correct and four incorrect.
In the section entitled Non-Verbal Reasoning, there were forty-eight questions in all. The fraudulent key covered the first thirty-two questions, of which it answered twenty-eight *337 correctly, three incorrectly, and omitted one. There were sixteen questions beyond where it ended. Of the twenty-eight questions answered correctly in the fraudulent key, this petitioner had twenty-six of those twenty-eight correct, as did the fraudulent key; of the three answered incorrectly in the fraudulent key, this petitioner answered those same three incorrectly in the same identical manner, although she might have answered each of them incorrectly in four different ways; and, of the one omitted, this petitioner attempted it, answering it incorrectly. Of the sixteen questions remaining beyond where the fraudulent key stopped, this petitioner attempted three, getting one correct and missing two.
In that section of the examination entitled Current Affairs, there were ninety questions in all. The fraudulent key purported to cover the first twenty-seven only of these questions, leaving sixty-three questions beyond where it ended. Of the first twenty-seven questions, the fraudulent key answered fifteen correctly, answered four incorrectly, and omitted eight. The petitioner herein answered the same fifteen that the fraudulent key had answered correctly in the same manner, correctly; of the four incorrect answers in the fraudulent key, petitioner answered three of those four incorrectly in the same manner, although there were four incorrect choices to each question; and, of the eight omissions in the fraudulent key between questions one and twenty-seven, petitioner omitted six of those eight and attempted to answer the other two, getting one correct and one incorrect. Of the sixty-three questions remaining beyond the point where the fraudulent key ended, this petitioner attempted eleven of those sixty-three, getting five correct and six incorrect.
There were two parts to Verbal Comprehension, designated as Part I and Part II. So far as the evidence discloses, there was no fraudulent key for Part I of Verbal Comprehension. In this section, there were forty questions. Of those forty questions, petitioner attempted eleven, getting three correct and eight incorrect, and making what is termed a raw score of one on that section. However, there was a fraudulent *338 key covering Verbal Comprehension, Part II, and this part contained thirty questions in all. The fraudulent key covered all thirty of the questions, by correct answers, incorrect answers and omission, having twenty-five answered correctly, four answered incorrectly, and one omitted. The petitioner answered sixteen correctly of the twenty-five answered correctly in the fraudulent key; answered incorrectly three of the four answered incorrectly in the fraudulent key in the same manner as they were answered incorrectly in the fraudulent key, although they might have been answered incorrectly in any one of four different manners, and omitted the other question answered incorrectly in the fraudulent key, and attempted the one question omitted in the fraudulent key, answering it incorrectly. Her raw score on this section was fourteen.
In the section entitled Guidance and Measurements in Education, there were forty-five questions in all. The fraudulent key stopped after question forty; and, between questions one and forty-one, it had twenty-six answered correctly, six answered correctly by the fraudulent key, petitioner had twenty-one of those twenty-six likewise correct; of the six answered incorrectly by the fraudulent key, the petitioner answered those same six questions incorrectly in the same identical manner as did the fraudulent key, although there were four incorrect choice to each of those six questions; and, of the eight omissions through the first forty questions, the petitioner omitted five of those eight that the fraudulent key omitted. There were five questions remaining beyond the point where the fraudulent key stopped, and the petitioner attempted one of those five, answering it incorrectly.
The above represents, in substance, the evidence presented to the State Board of Education to establish the fact that this petitioner used fraudulent assistance in the form of an aid or key while answering the questions contained in the National Teacher Examination, which she took on February 19th, 1949, in Columbia.
*339 The petitioner denied, in express terms, that she used any outside aid or assistance of any nature while taking the examination, and specifically denied the allegations contained in the Rule to Show Cause. She testified that the answers which she gave to the questions contained in the National Teacher Examination were the result of her own knowledge, and that she had no illegal or fraudulent aid or assistance while taking the examination. She further testified that, for a period of some four or five months prior to taking the examination, she studied practically every afternoon and every night to prepare herself better for this examination. The evidence indicates that she introduced before the two members of the Board of Education who took the testimony various books and periodicals which she had studied. Petitioner lives in Columbia, but teaches in a school at Prosperity, in Newberry County.
In further support of petitioner's position that she did not use any unlawful aid or assistance while taking this examination, her husband testified that he had observed her studying practically every afternoon and every night for some four or five months prior to the date when this examination was held, in February, 1949. One Daniel Thompson, who works for a newspaper in Columbia, and has worked for this newspaper continuously since 1942, testified that the reputation of petitioner for truth, veracity and honesty, was excellent, and that he did not believe that she would be guilty of any unlawful or dishonest conduct.
The purpose and scope of writs of certiorari are clearly expressed by The Supreme Court of South Carolina in Feldman v. South Carolina Tax Commission, 203 S.C. 49, 26 S.E. (2d) 22, 24, where it states: "A writ of certiorari cannot be made a substitute for an appeal or writ of error, as seems to have been done in this case. We have held in numerous cases that this Court on writ of certiorari will confine its review to the correction of errors of law only, and will not review the findings of fact of an inferior Court or body except when such findings are *340 wholly unsupported by the evidence. McKnight v. Smith, 182 S.C. 378, 189 S.E. 361; Young v. Sapp, 167 S.C. 364, 166 S.E. 354; Smith v. Saye, 130 S.C. 20, 125 S.E. 269; State ex rel. Davis v. State Board of Canvassers, 86 S.C. 451, 68 S.E. 676. Judges of the Courts of Common Pleas are bound by the same rule and limitation. Charles v. Byrd, 29 S.C. 544, 8 S.E. 1; State ex rel. Sawyer v. Fort, 24 S.C. 510".
The same rule is likewise announced in Smoak v. Rhodes, 201 S.C. 237, 22 S.E. (2d) 685; Jennings v. McCown, 97 S.C. 484, 81 S.E. 963; and Rawl v. McCown, 97 S.C. 1, 81 S.E. 958.
A careful review of the evidence in this case indicates that there was ample, and more than ample, testimony to support the finding of the State Board of Education when it held that this petitioner had used fraudulent aid and assistance, similar to that contained in the keys or aids appropriated from those actually taking the examination, when she took this examination on February 19th, 1949. The comparison between her examination paper or answer sheets, and the fraudulent key shows such striking similarity that it is almost an inescapable conclusion that this petitioner necessarily used aid similar to that of the fraudulent key when she took this examination. While it may be stated, as an abstract proposition, that almost anything is possible, the possibility of the similarity between her examination paper and this fraudulent key being accidental or coincidental is so extremely remote as to be almost infinitesimal.
Consequently, I am convinced, and hereby hold, that there was ample evidence, and much more than ample evidence, to support the finding of the State Board of Education.
Such being the situation as regards the facts and evidence in this matter were any errors of law committed by the State Board of Education when hearing the matter of this petitioner under the Rule to Show Cause issued by it?
*341 Petitioner alleges numerous errors committed by the State Board of Education in conducting this proceeding, chief of which is the fact that but two members of the State Board of Education took the testimony; whereas, petitioner asserts that it was necessary that a quorum of the State Board of Education take the testimony at the hearing in the proceeding in which she was involved.
Section 5280 of the Code of 1942, which relates to the State Board of Education, among other things, provides as follows: "A majority of the board shall constitute a quorum for transacting business".
The record discloses that the State Board of Education appointed two of its members, who may be designated "hearing members", to take the testimony at those hearings and to report such testimony to the full State Board of Education in meeting duly assembled, at which time the full State Board of Education received the report of the hearing members, considered the testimony taken by these hearing members, and then rendered its decision. The petitioner asserts that allowing but two members of the Board of Education to take the testimony constituted an unlawful delegation of power, with the result that the proceeding in which the testimony in the matter in which petitioner was involved was taken was illegal, null and void.
In determining whether there was or was not sufficient evidence to determine that this petitioner had used unlawful, fraudulent aid or assistance while taking the National Teacher Examination, it is clear that a quorum of the State Board of Education would have to pass upon this, since the determination of that question would clearly constitute transacting business, which requires the presence of a quorum of the Board of Education. The facts conclusively show, however, that two hearing members of the Board did not render decisions, but simply took the testimony and reported it to the full board. It is my opinion, and *342 I hereby hold, that such action did not constitute an unlawful delegation of power by the State Board of Education.
There is a good discussion of this particular question in 42 Am. Jur., Public Administrative Law, Paragraph 141, Pages 484 et seq., a portion of which is as follows: "Due process of law does not require that the actual taking of testimony be before the same officers as are to determine the matter involved. A hearing is not inadequate or unlawful merely because the taking of testimony is delegated to less than the whole number, or even to a single member, of the administrative tribunal, or to an examiner, hearer, or investigator employed for this purpose, even though such procedure has not been expressly authorized by the legislature. The actual decision must remain with and be made by the body constituted by the legislature, but it may be made on the report of the examining officer or body. * * * Where a hearing is required as a prerequisite to action by an administrative officer, the one who decides must hear. This rule does not, however, preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. But there must be a hearing in a substantial sense, and to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them".
The doctrine is fully discussed and stated by Mr. Chief Justice Wolfe, of the Utah Supreme Court, concurring specially in the decision in Crow v. Industrial Commission of Utah, 104 Utah 333, 140 P. (2d) 321, 148 A.L.R. 316. In that case, but one member of the Utah Industrial Commission attended the hearing, which was held on June 19th, 1941. This attending commissioner ceased to act as a member of the commission on June 30th, 1941, and the commission rendered its decision on August 14th, 1941. When the Commission *343 rendered its decision, the commissioner who had heard the testimony, and who had ceased to act as a commissioner in the interim, was not present, and the evidence established the fact that he not only did not participate in the decision, but he made no findings, either written or oral, which made his opinion of the evidence available to the commission in making its decision. On this ground the decision of the Industrial Commission was reversed. In its majority opinion, however, the Court uses the following language, 149 A.L.R. 319: "This does not necessarily require that all of the commissioners must be present at the hearing, or even that the one hearing the evidence must concur in the result, but his opinion on the testimony must be available to the commission in making its decision".
In his special concurring opinion, Mr. Chief Justice Wolfe reviews the authorities on this question in some detail, Crow v. Industrial Comm., 104 Utah 333, 140 P. (2d) 326, 148 A.L.R., at pages 320-323, and, in summarizing the doctrine applicable, states it to be as follows: "The upshot of the matter is that even where the Administrative Agency is performing functions in their nature judicial, as is the case in hearing compensation claims, the requirements of due process do not require that he who conducts the hearing must make or participate in the decision. It is not analogous to the situation where a judge dies or resigns after hearing the evidence but before registering his conclusions. There is usually continuity of personnel on Administrative Agencies even though there may be rotation in office. What is required to satisfy the demands of due process, that is, of a full or fair hearing, is that he who observes the witness and listens to the evidence must transmit his observations or conclusions to those others who, whether they are superiors or associate members of the same agency, are to decide and this may be done in the form of tentative findings or by a report or recommendations or orally in conference. And ordinarily where the examiner is still connected with the *344 agency at the time it renders its decision it will be presumed that he has communicated his observations and conclusions to the body which employes him or of which he is a part but where he has, shortly after the hearing and before decision is handed down, severed his connection with the agency, I see no objection to requiring that the record show that the remaining or new members who are to make the decision have had the actual benefit of his impressions and conclusions, and especially is this desirable where, as in the instant case, the outcome depends on nondocumentary evidence which is in sharp conflict."
As pointed out by Mr. Chief Justice Wolfe, there has been considerable misconception of the doctrine announced in Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 912, 80 L.Ed. 1288. The Morgan case does not hold, as it is sometimes cited as holding, that the administrative agency which renders a decision, in a quasi-judicial proceeding, must actually hear the evidence and see the witnesses. It does hold that the administrative agency which makes the findings must address itself to the evidence, and upon the evidence before it must conscientiously reach a conclusion which it deems such evidence to justify. In announcing this rule, however, the Supreme Court of the United States, speaking through Mr. Chief Justice Hughes, says: "This necessary rule does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates, Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense. And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them".
*345 In the matter now before me, the record shows that two members of the Board of Education actually took the testimony, which, as hereinabove set out, was fully developed, with petitioner's counsel cross examining witnesses as he saw fit. This testimony was not only presented to the full Board of Education when it met in regular meeting, but the record shows that a written summary of the evidence introduced against and in favor of the petitioner was presented to the full Board of Education when it met to consider the evidence and render its decision in the matter of petitioner herein. While the record in this particular matter does not so indicate, it was brought out at the hearing before me, as a matter of public record, that all nine members of the State Board of Education had attended a considerable number of these hearings, and this fact seems to be conceded by counsel for the petitioner.
The evidence showing the comparison between the master fraudulent key and this petitioner's examination paper, or answer sheets, is documentary in its nature, and the only evidence peculiarly applicable to this petitioner is the comparison between her examination paper and the fraudulent key, her testimony in denying that she used any fraudulent or illicit aid and assistance, the testimony of her husband that he knew that she had studied hard and constantly for some months prior to the examination, and the testimony of one character witness. The other evidence applies with equal force to each of those who were found by the Educational Testing Service to have submitted examination papers which corresponded substantially to the master fraudulent key; and, having heard this general testimony a number of times, a further repetition of hearing this testimony would not serve to enlighten the State Board of Education in its deliberations upon the matter.
As I construe the doctrine, due process requires that an administrative board, or body, when acting in a quasi-judicial capacity, must consider all the evidence *346 before rendering its decision upon any particular question. This does not mean that this administrative board, or body, must itself hear the evidence, but it must have the evidence before it, and consider such evidence when rendering its decision. The record and evidence shows that this requirement has been met in rendering its decision in the matter of the petitioner herein by the South Carolina State Board of Education.
Petitioner next asserts that, in notifying her that her certificate as a teacher in the public schools of South Carolina had been revoked, the State Board of Education notified her that it had been revoked for good and sufficient cause, and that such revocation is illegal, unlawful, and of no force and effect by reason of the fact that the State Board of Education does not have power to revoke Teachers' Certificates for good and sufficient cause, but only for immoral or unprofessional conduct, profanity, or evident unfitness for teaching.
In notifying petitioner that her state teachers' certificate had been revoked, the State Board of Education advised her that said Board, at its meeting on Wednesday, September 7, 1949, carefully considered the evidence brought out at the hearing on August 24th, 1949, when she was ruled to show cause why her certificate should not be revoked. The notice then proceeds to state that her certificate was revoked for good and sufficient cause.
The Rule to Show Cause, upon which a hearing in the matter of the petitioner was held on August 24th, 1949, clearly advised the petitioner that it had been made to appear to the State Board of Education that her State Teachers' Certificate should be revoked for immoral or unprofessional conduct and/or evident unfitness for teaching in that she had procured illicit or fraudulent aid and had used such aid for her assistance in taking the National Teacher Examination for the purpose of making a higher grade upon said examination than she was naturally capable *347 of making and to cheat and defraud the State of South Carolina, its taxpayers and certain of its school children.
In the light of the specifications set out in the Rule to Show Cause served upon petitioner, upon which a hearing was held on August 24th, 1949, it is hardly subject to controversy that this petitioner knew exactly why, and upon what grounds, her certificate was revoked by the State Board of Education. Had she never been granted a hearing, had she not heard all the evidence pertinent to her particular case, then it might be said, with some merit, that the notification to her of the revocation of her certificate was defective. However, she has had a full hearing, has been fully advised of the grounds upon which her certificate was revoked, and I find no merit in her position that the letter notifying her that her certificate had been revoked for good and sufficient cause, when considered with the Rule to Show Cause and hearing which preceded such letter was an unlawful exercise of power by the South Carolina State Board of Education.
There are numerous other objections offered by petitioner to the validity of this finding of the South Carolina State Board of Education, but I find nothing in any of them which would justify setting aside the decision of the State Board of Education for error of law in the proceeding which is the basis for the revocation of this petitioner's teachers' certificate.
The seven original fraudulent keys were all in evidence, the master fraudulent key was in evidence and available for comparison with each and all of these fraudulent keys confiscated from those taking the examination in South Carolina, a lengthy comparison of petitioner's examination paper with this master fraudulent key was made and, if petitioner desired further comparison made, her counsel was present at the hearing and had ample opportunity, on cross examination, to have those sections which had not been compared actually compared by this representative of the Educational Testing Service; and, in general, it appears to me that petitioner *348 has been fully advised and acquainted with all the evidence, facts and circumstances which are the basis for the Board's decision revoking her teachers' certificate, and has had ample opportunity to present all the evidence that she desired in opposition to such evidence.
For the foregoing reasons, therefore, it is
Ordered that the Petition of petitioner in this proceeding be, and the same hereby is, denied in every respect and detail, and that the action of the South Carolina State Board of Education be, and the same hereby is, affirmed.
And It Is So Ordered.
December 15, 1950.
PER CURIAM.
This Court is in full accord with the able and comprehensive decree of Judge Greneker, which will be reported. It is affirmed for the reasons therein stated. We shall only refer to two questions raised by appellant's exceptions but not discussed by Judge Greneker.
Appellant contends that the Board erred in admitting in evidence and considering certain documents, referred to as "fraudulent keys", which were taken from seven other examinees during the course of the examination involved in this controversy. At the time these documents were confiscated, they were being used at various places in the State for the aid and assistance of those from whom they were taken. The testimony shows that the contents of these seven documents, in so far as they related to the same subject matter, were practically identical. It was from these fraudulent "keys" that the "master fraudulent key" was compiled. A comparison of the examination papers with this master key disclosed that cheating had taken place on a wide scale.
Appellant says that there is no evidence connecting her with the fraudulent keys confiscated; that there is no proof that she had such a document in her possession *349 or that she was ever associated with those from whom they were confiscated; and that none of these keys were found in the school where she took her examination. But we think that this evidence was competent and relevant as establishing a strong link in the chain of circumstances showing that appellant had used similar aid on this examination. Although Judge Greneker held that this testimony was competent, we have referred to this question because it was not specifically discussed in his decree.
The contention is made that Judge Greneker erred in considering matters dehors the record. This question has reference to the following statement in the circuit decree: "While the record in this particular matter does not so indicate, it was brought out at the hearing before me, as a matter of public record, that all nine members of the State Board of Education had attended a considerable number of these hearings, and this fact seems to be conceded by counsel for the petitioner." Counsel for appellant says that they made no such concession and that this statement evidently was taken from facts stated in argument by counsel for respondent. But this inadvertence on the part of the Court resulted in no prejudice to appellant. The fact mentioned is not material and it is apparent from the decree of the learned Circuit Judge that it did not affect his conclusion.
It may be of interest to state that an action was brought in the United States District Court to have declared unconstitutional the statute under which the Board proceeded and to enjoin the enforcement of the orders by the Board revoking the certificates of a number of Negro teachers. The case was heard by a Court of three Judges convened pursuant to the applicable Federal statute. In a well considered opinion by Judge Parker, Shirer v. Anderson, D.C., 88 F. Supp. 858, 862, the Court referred approvingly to the order of Judge Greneker and stated: "It is absurd to say that the Board's action was not supported by the evidence or was *350 arbitrary or unreasonable. The question involved was a pure question of fact; and, in deciding it, the Board was at liberty to consider circumstantial as well as direct evidence, and the circumstances relied on were of strong probative value. The fact that a widespread cheating conspiracy was shown to have existed, that fraudulent keys were found, and that the papers turned in by the accused teachers corresponded in so many details with the fraudulent keys,  these taken together unquestionably furnished substantial basis for the Board's action."
All exceptions are overruled and the decree of Judge Greneker, as supplemented by the views expressed herein, is adopted as the opinion of this Court.
FISHBURNE, STUKES, TAYLOR, and OXNER, JJ., concur.
BAKER, C.J., not participating.